FILED
U. S. DISTRICT COURT
NEW ALBANY DIVISION

15 FEB -2 AM 11: 03

SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

## IN UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## NEW ALBANY DIVISION

UNITED STATES OF AMERICA *ex rel.* and ABDUL G. BURIDI,

    Plaintiffs,

v.

KENTUCKIANA MEDICAL CENTER, LLC

KMC REAL ESTATE INVESTORS, LLC

RL BB-IN KRE OP, LLC

RL BB-IN KRE RE, LLC

RL BB FINANCIAL, LLC

RIALTO CAPITAL MANAGEMENT, LLC

HALL-ROBB, LLC

CHRISTODULOS STAVENS

ELI HALLAL

JEFFREY CAMPBELL

RENATO LAROCCA,

    Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**4 :15** -cv- **0 1 4 SEB -WGH**

Civil Action No.   .  _____

**Filed Under Seal Pursuant to 31 U.S.C. § 3729 *et. seq*.**

## VERIFIED COMPLAINT

DO NOT PLACE IN PRESS BOX

DO NOT ENTER ON PACER

1

Relator, Dr. Abdul G. Buridi, M.D. files this Verified Complaint against Kentuckiana Medical Center, LLC, Rialto Capital Management, LLC, RL BB Financial, LLC, RL BB-IN KRE OP LLC, RL BB-IN KRE RE LLC, KMC Real Estate Investors, LLC, Hall-Robb LLC, Christodulos Stavens, Eli Hallal, Jeffrey Campbell, and Renato LaRocca (collectively "Defendants"), pursuant to the False Claims Act, 31 U.S.C. § 3729 *et seq.* (hereinafter "FCA") to recover damages and civil penalties resulting from false statements and claims that Defendants made or presented, or conspired with other Defendants to make or present, to the United States. The violations arise out of certain Defendants' requests for payment to Medicare and Medicaid (hereinafter, the "U.S.") based on false statements or claims regarding compliance with the Stark Law and Anti-Kickback Statute ("AKS").

## INTRODUCTION

1.     The Hospital has at all relevant times been engaged in the business of operating a full service hospital and filing claims with the U.S. seeking payment for medical services provided at the Hospital.

2.     The Stark Law and AKS violations alleged herein have occurred at various times since 2007 and have continued through the present. These violations have occurred under various guises, at different times, and have involved a number of different corporate and individual actors acting in concert.

3.     As set forth in detail below, four physicians who are key patient referral sources to the Hospital have been knowingly offered and provided a variety of kickbacks and valuable benefits for the purpose of inducing referrals to the Hospital.  These physicians also have had, and continue to have, financial relationships with the hospital, through debt relationships, informal and undisclosed compensation arrangements, and other prohibited means which are per

2

se unlawful. During the time in which these kickbacks and prohibited financial relationships took place, the hospital filed claims with the U.S. seeking reimbursement for medical services provided under federal health care programs while falsely certifying compliance with the Anti-Kickback Statute and the Stark Law, giving rise to liability under the FCA.

4.      Relator brings this action for violations of the FCA on behalf of himself and the United States of America pursuant to 31 U.S.C. § 3730(b)(1).

5.      As required by the False Claims Act, 31 U.S.C. § 3730(b)(2), the Relator has provided the Attorney General of the United States and the United States Attorney for the Southern District of Indiana, simultaneous with the filing of the original Verified Complaint, a statement of all material evidence and information related to the Verified Complaint. The disclosure statement is supported by material evidence known to the Relator at his filing, which establishes the existence of Defendants' violations of the FCA.

6.      The fraud and false claims described *infra* occurred at the Hospital in Clark County, Indiana.

7.      At all times relevant hereto, Defendants acted through their agents and employees and the acts of Defendants' agents and employees were within the scope of their agency and employment. The entity Defendants have at all times acted through their agents in concert and coordination with one another. The actions, policies and practices of the entity Defendants were, upon information and belief, set or ratified by, or pursued in concert and with the active participation of, the individual Defendants named herein.

8.      To the extent, if any, that this case is deemed to be a "related action" and to the extent that any facts set forth herein are deemed to be the same as a fact underlying an existing *qui tam* FCA action pending at the time of filing of this action, as set forth in 31 U.S.C.

3

§ 3730(e), said factual allegations in common with any pending action that would cause this case to be a "related action" are hereby expressly excluded from this action, but only to the limited extent necessary to avoid the statutory preemption.

9.      Furthermore, to the extent that any of the allegations or transactions set forth herein are the subject of a civil suit or an administrative civil money penalty proceeding in which the United States is already a party, if any such proceedings exist, then the allegations or transactions referred to herein which are the subject of any such civil suit or administrative civil money penalty proceedings are expressly excluded, but only for the specific time periods, specific companies, and/or specific allegations or transactions that are already the subject to such civil suit and/or administrative civil money penalty proceeding.

## PARTIES

10.      The real party in interest to the FCA claims in this action is the United States of America.

11.      Relator, Abdul G. Buridi ("Relator"), is a resident of Louisville, Kentucky, which is located in Jefferson County, Kentucky.  Relator is one of approximately thirty physician investors in the Hospital and KMC Real Estate Investors, LLC (the "Physician Investors") prior to the emergence of these entities from bankruptcy.  Relator was also a creditor and party in interest in the bankruptcy cases filed by these entities in the United States Bankruptcy Court for the Southern District of Indiana, New Albany Division, Case Nos. 10-93039 and 11-90930 (the "KMC Bankruptcy Cases"), respectively.  Relator has filed appeals in the KMC Bankruptcy Cases which are presently pending.

12.      Relator is an "original source" of the information set forth herein within the meaning of 31 U.S.C. § 3730(e)(4)(B), and states that his knowledge concerning Defendants'

4

FCA violations has not been publicly disclosed other than as set forth in the appeals in the KMC Bankruptcy Cases.

13.     Defendant, Kentuckiana Medical Center, LLC (the "Hospital") is a full service general hospital providing, among other things, general surgery, cardiovascular treatment, gastroenterology, infectious disease treatment, neurology, nephrology and urology, with its primary place of business and principal office located in Clark County, Indiana. The Hospital was originally established as a 49% physician-owned hospital, with the rest of the ownership interests held by Cardiovascular Hospitals of America, LLC ("CHA").

14.     Defendant, KMC Real Estate Investors, LLC ("KMCREI"), is a real estate holding company, with no business or employees, which exists solely to lease office space to the Hospital.  Its primary place of business is located in Clark County, Indiana.  KMCREI was originally owned by certain of the Physician Investors and CHA.

15.     Defendant, RL BB Financial, LLC ("RL BB"), is a Delaware limited liability company with its principal place of business located at 790 NW 107th Avenue, Suite 400, Miami, Florida  33172.  Since 2010, RL BB has held and continues to hold a first mortgage on KMCREI's real property.  RL BB was the largest secured creditor in the KMC Bankruptcy Cases, and it actively influenced the formulation of the plans of reorganization for the Hospital and KMCREI.

16.     Defendants RL BB-IN KRE OP, LLC and RL BB-IN KRE RE, LLC (collectively "RL BB-IN") are Delaware limited liability companies with their principal places of business located at 790 N.W. 107th Avenue, Suite 300, Miami, FL 33172.  Upon information and belief, RL BB-IN OP, LLC served as the Exit Investor in the KMC Bankruptcy Cases.  Upon information and belief, RL BB-IN OP, LLC became the 100% equity owner of the Hospital,

while RL BB-IN KRE RE, LLC became the 100% equity owner of KMCREI, after they emerged from bankruptcy. RL BB-IN is under common control with its affiliate RL BB. In this complaint, the three entities will for convenience sometimes be referred to collectively as "RLBB."

17.     Defendant, Rialto Capital Management, LLC ("Rialto"), is a Delaware limited liability company, with a principal place of business located at 790 NW 107th Avenue, Suite 400, Miami, Florida  33172. At all times, Rialto actively participated in formulating the plans of reorganization in the KMC Bankruptcy Cases through its ownership and control of RL BB and/or RL BB-IN.

18.     Rialto is a dealer in massive pools of distressed loans. It services such loans and packages them as marketable securities.[1] It was reported in 2012 that Rialto had paid an average of 43 cents on the dollar for these loans.[2] Rialto has been the beneficiary of billions in taxpayer dollars. As reported by the Special Inspector General for the Troubled Asset Relief Program (SIGTARP), Rialto was the sub-advisor to one of only eight fund managers granted the special privilege to receive matching investments from the federal government to finance massive acquisitions of legacy commercial mortgage backed securities.[3] The rates of return on these investments have been exorbitant.[4]

---

[1] For example, in a transaction underwritten by JP Morgan Chase & Co., issued bonds supported by a portfolio containing similar non-performing loans. Al Yoon, "JP Morgan Revives Sales of Distressed-Commercial-Mortgage Bonds," *4-Traders*, 03/29/2012 (available at 4-Traders.com); Sarah Mulholland, "JP Morgan, Wells Fargo Said to Offer $132 Million Rialto CMBS," March 29, 2012, *Bloomberg.com*; Max Adams, "JP Morgan Non-Performing Deal Flies Off Shelf," April 13, 2012, *Realestatefinanceintelligence.com*.

[2] See Yoon, above.

[3] Office for the Special Inspector General for the Troubled Asset Relief Program, Quarterly Report to Congress, July 21, 2009, "PPIF Manager Selection," p. 87

[4] Office for the Special Inspector General for the Troubled Asset Relief Program, Quarterly Report to Congress, July 25, 2012, Table 2.38, p. 139.

19.     Defendant, Hall-Robb, LLC ("Hall Robb"), is an Indiana limited liability company, with its principal place of business located at 109 Brandywynne Lane, New Albany, IN 47150.  Hall-Robb was a creditor and active participant in the KMC Bankruptcy Cases. Hall Robb has at all relevant times been majority owned and/or controlled by Stavens, Hallal, Campbell, LaRocca, and family members of Stavens and Hallal.

20.     Defendant, Eli Hallal ("Hallal"), is an individual residing at 109 Brandywynne Lane, New Albany, Indiana 47150.  Hallal is a present Director of KMCREI and one of the top referring doctors to the Hospital. Prior to the KMC Bankruptcy Cases, Hallal was a member of the Hospital Board and a controlling person of the Hospital.

21.     Defendant, Christodulos Stavens ("Stavens"), is an individual residing at 1235 Forest School Lane, Anchorage, Kentucky 40223.  Stavens is a Director of KMCREI and one of the top referring doctors to the Hospital.  Prior to the KMC Bankruptcy Cases, Stavens was a member of the Hospital Board and a controlling person of the Hospital

22.     Defendant, Renato LaRocca ("LaRocca"), is an individual residing at 2201 Goshen Lane, Goshen, Kentucky 40245.  LaRocca is a Director of KMCREI and one of the top referring doctors to the Hospital. Prior to the KMC Bankruptcy Cases, LaRocca was a member of the Hospital Board.

23.     Defendant, Jeffrey Campbell ("Campbell") is an individual residing at 1902 Arnold Palmer Boulevard, Louisville, Kentucky 40245.  Campbell is a Director of KMCREI and one of the top referring doctors to the Hospital. On or about April 23, 2014, it was reported that Campbell was an owner of Physicians Primary Care, a medical practice which was raided by federal agents in connection with a federal investigation involving prescriptions of controlled substances.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over this case pursuant to 31 U.S.C. § 3730(b), which allows a private person to bring suit for a violation of the FCA; pursuant to 28 U.S.C. § 1345, which provides the District Courts with original jurisdiction over all civil actions commenced by the United States of America; and pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States.

25.     The acts proscribed by 31 U.S.C. § 3729 *et seq.* and complained of herein were performed by the Defendants who transact business and/or reside in the Southern District of Indiana. Therefore, this Court has personal jurisdiction over defendants, and venue is proper in this district, pursuant to 31 U.S.C. § 3732(a). Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## STATUTORY AND REGULATORY BACKGROUND

### I.     The False Claims Act

26.     Relator's claims are brought pursuant to the FCA, 31 U.S.C. §§ 3729–33. Generally speaking, The FCA authorizes private citizens to bring actions on behalf of the federal government to recover amounts that were paid by the U.S. for false claims that were submitted with knowledge that the claims were false. 31 U.S.C. §§ 3729(a), 3730(b). False claims include any claims that falsely certify compliance with the Stark Law and the AKS, when the filer in fact was acting in violation of, or with knowledge of violation of, such laws. *See, e.g., U.S. ex rel. Kosenske v. Carlisle HMA, Inc.*, 554 F.3d 88, 94 (3d Cir. 2009).

## II.     The Anti-Kickback Statute

27.     The AKS generally prohibits kickbacks or other payments made to induce or reward the referral or generation of federal health care business. 42 U.S.C. § 1320a–7b(b)(2)(A).

28.     The AKS makes it a crime to knowingly and willfully offer, pay, solicit or receive any remuneration to induce a person (1) to refer an individual to a person for the furnishing of any item or service covered under a federal health care program; or (2) to purchase, lease, order, arrange for or recommend any good, facility, service, or item covered under a federal health care program. 42 U.S.C. § 1320a-7b(b)(l) and (2).

29.     The term "any remuneration" includes anything of value and broadly encompasses any kickback, bribe, or rebate, direct or indirect, overt or covert, cash or in kind. 42 U.S.C. §1320a-7b(b)(1). Federal courts have held that the AKS is violated where *one purpose* of the remuneration is to induce referrals, even if other legitimate business purposes exist. *See United States v. Greber*, 760 F.2d 68, 71-72 (3d Cir. 1985); *United States v. Kats*, 871 F.2d 105, 108 (9th Cir. 1989); *United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998); *United States v. McClatchey*, 217 F.3d 823, 835 (10th Cir. 2000); *United States v. Borrasi*, 639 F. 3d 774, 782 (7th Cir. 2011)

30.     Recent amendments to the Anti-Kickback Statute have eliminated the need for a person to have "actual knowledge … or specific intent to commit a violation" of the Statute. 42 U.S.C. § 1320a–7b(h).

## III.     The Stark Law

31.     To the same end, the Stark Law prohibits a hospital (or other entity providing health care items or services) from submitting Medicare claims for payment based on patient

referrals from physicians having a "financial relationship" with the hospital, unless an enumerated exception applies. 42 U.S.C. § 1395nn.

33. Under the Stark Law, a financial relationship exists where a physician has an direct or indirect ownership or investment interest in, or compensation arrangement with, an entity which provides designated health services. 42 U.S.C. § 1395nn(a)(2); 42 C.F.R. § 411.354(a)(1)(ii).

33. A prohibited ownership or investment interest may be through "equity, debt, or other means," and it includes an interest in any entity that holds an ownership or investment interest in any other entity providing the designated health service. *Id.* A "compensation arrangement" can be "any arrangement involving remuneration, direct or indirect, between a physician ... and an entity." 42 C.F.R. § 411.354(c). "Remuneration," is defined under the Stark Act as "any remuneration, directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. § 1395nn(h)(1)(B).

34. The Stark Law is a strict liability statute. If an otherwise prohibited financial relationship does not meet an exception, every referral made by the physician with such relationship is considered a prohibited referral.

## FACTUAL ALLEGATIONS

**I.** **Rialto Has Caused the Hospital to Provide Kickbacks and Valuable Benefits To Physicians to Induce Referrals and Thereby Advance Its Financial Interest In The Hospital.**

35. Relator realleges and incorporates by reference the previous allegations of the Verified Complaint.

36. In 2007, the approximately thirty Physician Investors purchased membership interests in Kentuckiana Investors, LLC, which owned 49% forty-nine percent of the Hospital. In

connection with their investment in the Hospital, the physicians were required by their operating agreement to guaranty a share, in proportion to their ownership percentages, of the Hospital's and KMCREI's obligations to creditors.

37.    The planned 60 bed hospital was never completed and a 34 bed building opened in a severely undercapitalized state, with only ten beds operational. Unable to generate sufficient revenue to operate and pay its bills, the Hospital quickly became insolvent.

38.    Soon the Hospital had defaulted on its multi-million dollar obligations to First Tennessee Bank, its primary secured lender, and various other lessors of very expensive medical equipment used by the Hospital.

39.    On September 9, 2010, the Hospital voluntarily commenced its Chapter 11 bankruptcy case in the United States Bankruptcy Court for the Southern District of Indiana, New Albany Division, Case No. 10-93039 (the "Hospital Bankruptcy").

40.    Since the Hospital could not pay its rent, its landlord KMCREI was also struggling financially and soon defaulted on its $21.5 million dollar construction loan. After the default, BB&T sold this loan and the associated personal guarantees at a discount to RL BB.

41.    Rialto thereafter caused RL BB to institute a foreclosure proceeding against KMCREI in Clark County, Indiana.

42.    On April 1, 2011, KMCREI filed its own bankruptcy case in the Southern District of Indiana, New Albany Division, Case No, 11-90930.  The KMCREI Bankruptcy Case stayed the foreclosure proceeding (the "KMCREI Bankruptcy").

43.    For about two years, the Hospital and KMCREI proposed various plans to emerge from bankruptcy, none of which came to fruition due to the lack of a financial commitment from a new investor which would be willing and able to infuse new capital necessary to complete the

construction of the Hospital. RL BB had initially opposed the proposed plans of reorganization due to what it saw as unfavorable treatment of its mortgage debt. Eventually Rialto decided that it would become the new owner of the Hospital through its affiliates.

44.     Specifically, in June of 2013, RL BB-IN OP, LLC, as Exit Investor, agreed to finance both the Hospital's and KMCREI's exit from bankruptcy under new proposed plans of reorganization which were approved later that fall.

45.     Under the Hospital's Third Amended Plan of Reorganization dated June 14, 2013 (the "Hospital Plan"), the Exit Investor would own 100% of the equity in the Hospital.

46.     KMCREI's Third Amended Plan of Reorganization, also dated June 14, 2013 (the "KMCREI Plan"), provided for the restructuring of RL BB's $21.5 million secured loan and cash payment of $538,573.79 to Clark County, Indiana, to satisfy past due real estate taxes.

47.     Due to its assumption of a 100% ownership interest and its required capital investment in the Hospital and KMCREI, Rialto gained a much larger and more direct interest in the Hospital's financial success than it had previously had as merely a mortgage note holder.

### A. The Hospital and Rialto Offer Referring Doctors Twenty Percent of the Equity of KMCREI as a Kickback to induce continued referrals.

48.     KMCREI's Plan contained the following provision:

> The remaining 20% of new membership interests in the Debtor [KMCREI] shall include voting and distribution rights, and shall be issued to Dr. Christodulous Stavens, Dr. Eli Hallal, Dr. Jeffrey Campbell and Dr. Renato LaRocca in consideration of their ongoing commitment to the hospital and their importance to the feasibility of this Plan and the [Hospital] Plan."

*KMCREI Plan*, at Section 8.4 (*clarification added*).

49.     Thus, KMCREI's Plan, which is recognized in bankruptcy law to be contractual in nature, explicitly offered to pay membership interests to Drs. Stavens, Hallal, Campbell and LaRocca.

50.     Relator objected to the KMCREI Plan under the Absolute Priority Rule, among other issues.  The Absolute Priority Rule prohibits insiders/investors being given equity without new value being given by such insiders/investors. Section 1129(b)(2)(B)(ii) of Title 11 of the United States Code. This issue was taken up by the bankruptcy court at the hearing to consider the confirmation of the plans.

51.     When asked at the hearing what new value these physicians were giving to KMCREI, the Hospital's counsel stated that "the new value that's being provided by these four docs to this hospital, these four docs provide 75 percent of the admissions to [the Hospital] which in fact is then going to pay rent to KMCREI so the building doesn't get foreclosed on."

52.     Testimony at the confirmation hearing confirmed that referrals from Stavens, Hallal, Campbell and LaRocca accounted for 70-80% of the admissions to the Hospital.

53.     The Hospital's counsel further argued:

And as a practical matter Rialto is going to end up with 100 percent ownership and ultimately transfer 20 percent of their ownership interest to these four doctors. All this amendment was doing is saying, look, we're trying to have full disclosure here, we're not trying to play hide the ball. That ultimately the end result is 80 percent Rialto, 20 percent the docs.

54.     The evidence adduced at the hearing confirmed that a primary purpose of the KMC and KMCREI Plans was to induce four key referral sources to continue making referrals by offering them a 20% stake in KMCREI, so as to ensure the financial success of the Hospital and, derivatively, to benefit Rialto.

55.     The above conduct violates the AKS because it intentionally offered to reward equity for the purpose of inducing patient referrals to the Hospital.

**B.**  **The Hospital and Rialto Arrange for an Injunction Designed to Protect Referring Doctors from Multiple Lawsuits as another Kickback.**

56.     A key part of the Hospital Plan was a proposed injunction which would preclude the Hospital's many secured creditors from pursuing Physician Investors on their personal guaranties as long as such creditors were being timely paid through the Plan. The injunction addressed the fact that the Physician Investors, over the preceding two years, had faced a wave of creditor lawsuits, resulting in millions of dollars in collections, harassing collection efforts, burdensome legal fees, and in many cases personal bankruptcies.[5]

57.     At the time the Plans were being proposed, Relator was engaged in hard-fought and expensive state court litigation involving Hallal, Stavens, Campbell, and LaRocca. Relator's derivative lawsuit against Stavens and Hallal dated back to 2011 and alleged, among other things, theft of hundreds of thousands of Physician Investor funds. More recently, in response to a lawsuit filed by Hall Robb against Relator and others to enforce their personal guaranties of the First Tennessee indebtedness purchased by Hall Robb,[6] Relator and his co-defendants counterclaimed against Hallal, Stavens, Campbell, and LaRocca alleging abuse of process.

58.     At least one other Physician Investor had in the preceding year obtained six figure judgments against Stavens and Hallal to enforce their indemnity obligations. Other Physician Investors were considering bringing similar claims against Stavens and Hallal.

59.     In order to protect Hallal, Stavens, Campbell, and LaRocca from having to defend against Relator's and other physicians' lawsuits, and to deter others from pursuing claims, the Hospital and Rialto proposed an eleventh hour amendment to the Hospital Plan to include the following provision:

---

[5] In the midst of the chaos and stress from the onslaught of collection activities, marriages were broken and one physician even suffered a fatal heart attack.

[6] The Hall Robb transaction is discussed in further detail, *infra*, at subsection d.

> Notwithstanding anything in this Confirmation Order and in Article XI of the Plan to the contrary, in the event that any guarantor or any co-obligor of the Debtor either (a) becomes a debtor under title 11 of the U.S. Code or (b) **commences or continues any action against** the Debtor, KMCREI, or **any equity holder in the reorganized Debtor or KMCREI**, then the injunctions set forth in this Confirmation Order shall automatically terminate and shall not apply to such guarantor or such co-obligor and/or their property

*Amended Plan*, Section 9, pg. 11 (emphasis added).

60.     As set forth in the KMCREI Plan, Hallal, Stavens, Campbell, and LaRocca were to become twenty percent equity holders in the reorganized KMCREI. Thus, under the express language added to the injunction provision at the last minute, any Physician Investor who pursued any claims against these select individuals would lose the valuable protections of the injunction against creditors and would once again be exposed to the risk of aggressive collection efforts on their personal guaranties.

61.     The new language was intended to, and did in fact, deter Physician Investors from continuing to pursue claims against Hallal, Stavens, Campbell, and LaRocca, resulting in valuable benefits to these four individuals. In other words, the Hospital Plan developed by the Hospital and Rialto offered a second valuable benefit – shelter from then-pending and future civil suits – to the same four doctors whose referrals made up 70-80% of patient admissions as an inducement for them to continue referring patients at the same rate.

## C.   Rialto Forbears From Collection Efforts on RLBB's Huge Judgments Against Referring Doctors

62.     The 2010 bankruptcy filings by the Hospital and KMCREI protected these entities from creditor's lawsuits as a result of the automatic stay.  The automatic stay did not extend to creditor claims against the Physician Investors who were forced to defend multiple legal actions to enforce their personal guaranties.  Some declared bankruptcy, others settled for large sums, still others defended the suits at great personal expense.

63.     In 2011, RL BB followed other creditors by filing an action against Relator and the other physicians to enforce their personal guaranties.

64.     On August 2, 2011, the court entered a summary judgment in favor of RL BB and against the Physician Investors to enforce their personal guaranties of the BB&T mortgage loan acquired by RLBB.  Final judgment was entered on the guaranties on September 8, 2011.

65.     The total amount due to RL BB at the time of judgment was $20,606,597.77. Hallal was adjudged to owe RL BB $4,099,534.00. Stavens was adjudged to owe RL BB $3,781,544.00. Campbell was adjudged to owe $1,075,000.00. Together, the three were adjudged to owe RL BB $8,956,078.00, or almost half of the entire amount due to RL BB. No physician investor owed RL BB more than Stavens and Hallal owed.

66.     RL BB immediately commenced extremely aggressive collection efforts on these judgments, including all the usual post-judgment remedies plus tactics to induce settlement by the Physician Investor such as noticing depositions of spouses and sending the sheriff to their homes.  Certain Physician Investors were selected as targets to receive the brunt of the collection efforts.  A number of these Physician Investors ultimately gave up and elected to settle with RL BB.  Upon information and belief, the aggregate settlement amounts totaled more than seven figures.

67.     Although RL BB initially pursued Stavens and Hallal on their judgments, it eventually ceased any collection efforts against them, despite the fact that they had by far the largest judgments against them. Since they were referring patients to the Hospital, RL BB obviously knew how to find and garnish them but simply chose not to do so.  RL BB's decision to forbear from further settlement efforts against Stavens and Hallal coincided with Rialto's business decision to become an owner of the Hospital rather than simply a creditor. That

business decision required good relations with Stavens and Hallal due to their critically important role as patient referral sources. Upon information and belief, Campbell also received preferential treatment in regard to judgment enforcement efforts. Upon information and belief, Stavens, Hallal, and Campbell have not paid amounts on their judgments (if any) which are material in relation to the amounts owed and/or have not paid amounts reasonable in relation to what other non-referring Physician Investors have been forced to pay.

68.     In short, RL BB has provided forbearance from collection activities on almost nine million dollars of debt as an inducement to Hallal, Stavens, and Campbell to continue to refer patients to the Hospital.

69.     Under the Plans, the noticeable exception to the injunction against creditor collection efforts was that RL BB would not be subject to the injunction and would be free to continue collection efforts against the Physician Investors. Therefore, even post-bankruptcy, RL BB's voluntary forbearance from pursuing millions of dollars of judgments against these referral sources has continued to provide value benefits to them.

70.     Additionally, on or about November 22, 2013, a few months after the KMC Plan was approved, RL BB released its judgment lien on Stavens' personal residence, thus removing encumbrances to its sale or mortgage. Similarly, in late 2013, after the KMC Plan had been approved, both Hall Robb and the Leasing Group also released their judgment liens on Stavens' personal residence. These releases were given before either entity had been paid what it was owed under the KMC Plan. By contrast, the judgments held by these entities against rank-and-file Physician Investors such as Relator were not released until well into 2014 after they had been paid in full.

71.     Upon information and belief, no such accommodations have been forthcoming to the non-referring Physician Investors against whom RL BB has obtained judgments and filed judgment liens. Since the inception of the Hospital, Relator has not referred one case to the Hospital for fear of Stark Law violations.   In turn, Relator remains subject to a wage garnishment, has paid tens of thousands of dollars to RL BB, and has had to repulse RL BB's efforts to seize his medical practice.

### D. Rialto and the Hospital Work to Ensure that Hospital Debt Held Indirectly By Referring Doctors Is Paid Quickly And Completely

72.     Hall Robb is an Indiana limited liability company formed on May 12, 2009 with only two initial members: Hallal and Hallal's wife's cousin, Phil Robertson. The name of the company is a combination of the two men's last names. Pursuant to Hall Robb's operating agreement, Hallal was designated the initial manager. Hallal testified in a deposition given in 2011 in the Hospital Bankruptcy Case that he and Robertson ran Hall Robb.  As late as the fall of 2013, Hallal was designated by Hall Robb under Civil Rule 30(b)(6) to give binding testimony on behalf of the company in its lawsuit to enforce personal guaranties of certain Physician Investors.

73.     In 2010, when the Hospital started to sink, First Tennessee Bank initially emerged as the most aggressive creditor. First Tennessee had almost immediately filed an action in Clark County, Indiana Circuit Court (Case Number 10001-1007-MF-001312) against the Physician Investors on their personal guaranties, and it had a lien on the Hospital's accounts receivable.

74.     At the behest of Stavens and Hallal, Hall Robb was initially presented to the Physician Investors as a white knight to purchase the Hospital debt held by First Tennessee. On or about January 19, 2011, Hall Robb purchased the First Tennessee indebtedness for $2,550,000, a steep discount off the approximate $5,000,000 face amount of the note.  As of the

18

purchase, Hallal, Stavens, Campbell, LaRocca, and members of their families collectively owned at least 87.04% of Hall Robb.

75.     At the time Hospital was first established, the "whole hospital exception" to the Stark Law allowed physicians to have ownership or investment interests in a general acute care hospital to which they referred patients. This was effectively ended by the Affordable Care Act in 2010, subject to conditional grandfathering with respect to physician ownership or investments in hospitals which existed as of December 31, 2010. *See* 42 U.S. Code § 1395nn(a), (d), (i)(1)(A).

76.     To the extent that these four doctors were responsible for 70-80% of patient admissions to the Hospital, their indirect debt relationship with the Hospital through Hall Robb was an obvious Stark Law violation because this investment interest in secured debt of the Hospital did not exist as of December 31, 2010, as required under the 2010 Stark law amendments.

77.     Upon information and belief, the Hospital and the four referring doctors also failed to make the legally required disclosures of their investment interest in the Hospital through Hall Robb, as required under the 2010 Stark law amendments. *See* 42 U.S. Code § 1395nn(i)(1)(A).

78.     The purchase of the First Tennessee debt by Hall Robb in early 2011 temporarily halted collection efforts on the First Tennessee guaranties and took some pressure off the Hospital.  Soon thereafter, Hall Robb took agreed judgments against eleven Physician Investors who were defendants in the Clark County, lawsuit. These included judgments against Stavens ($1,905,174.13);     Hallal     ($2,160,099.13);     Campbell     ($1,011,699.13);     and     LaRocca ($782,761.13).  A key motivation for the agreed judgments was the belief that they would hinder

other creditors by allowing Hall Robb, a purportedly friendly creditor, to serve as a "firewall." The firewall proved to be legally flawed and ineffective. Not only did it fail to slow down other creditors, but it resulted in Hall Robb having a legal right to enforce large judgments against any Physician Investor foolish enough to voluntarily agree to one.

79.     Hall Robb ultimately turned against the Physician Investors and began to enforce agreed judgments against those who were not also equity owners of Hall Robb. Hall Robb also began to pursue enforcement of the First Tennessee guaranties signed by the Relator and five other Physician Investors who were perceived as hostile to the Bankruptcy reorganization efforts and allied with Buridi against Stavens and Hallal. *See Hall Robb, LLC v. Buridi, et al.*, Jefferson Circuit Case Number 13-CI-03296.

80.     The indebtedness held by Hall Robb was eventually addressed through the KMC Bankruptcy. As eventually approved in October 2013, the Hospital Plan called for the Exit Investor to provide funds necessary to pay the secured creditors of the Hospital. Among these payments to be made by the Hospital was the payment of approximately $5,000,000 to Hall Robb on the note it had acquired for $2,550,000. This amount was to be paid over several years under the terms of a new promissory note.

81.     Hall Robb did not have to wait until the due date for payment under the Hospital Plan. The amounts owed by the Hospital on the Hall Robb note were paid in advance of that due date. Upon information and belief, this occurred sometime in the latter half of 2014, less than a year after confirmation. This payment retired the original First Tennessee indebtedness and required Hall Robb to drop its claims against the Relator and his five co-defendants in the Jefferson Circuit Court action. At the behest of Rialto, Hall Robb negotiated for the dismissal of the counterclaims against Hallal, Stavens, Campbell, and LaRocca. Upon information and belief,

these referring doctors did not pay anything to settle the claims against them and were included in the release as a gratuity.

82.     Thus, the Hospital and Rialto arranged for remuneration, in the form of valuable benefits to Hallal, Stavens, Campbell, and LaRocca by (1) causing their investment vehicle, Hall Robb, to receive accelerated payment of its promissory note and by causing the counterclaims against these four referring doctors to be dismissed and (2) causing Hall Robb's huge agreed judgments against Stavens, Hallal, Campbell and LaRocca to be satisfied.

83.     Since the time that Rialto ascended to the role of ultimate Hospital owner, it has, in concert with the Hospital, RL BB, and RL BB-IN, engaged in a persistent pattern of conduct designed to protect and reward the Hospital's key patient referral sources, including by (1) offering them equity in KMCREI; (2) providing them protection from lawsuits brought by Physician Investors and helping to settle such lawsuits; (3) forbearing from enforcing RL BB's own multi-million judgments against them; and (4) pre-paying indebtedness held indirectly by them through Hall Robb, which also had the effect of satisfying judgments against them.

84.     These benefits were intended to, and did, serve as an inducement to Hallal, Stavens, Campbell, and LaRocca to continue to provide referrals accounting for 70-80% of the Hospital's patient admissions, in violation of the AKS. These benefits also constitute a prohibited debt relationship and/or compensation arrangement in violation of the Stark Law. As a result of the accelerated repayment of the Hall Robb note, Rialto and the Hospital addressed the existing Stark Law violation arising from Hall Robb's investment interest in the Hospital, but in doing so merely created a new Stark Law violation based on the provision of valuable benefits to the referring physicians.

## II.     The Physician Investors' Personal Guarantees Of Hospital Debt and Resulting Judgments Against Them Created a Financial Relationship

## With the Hospital Through Debt or Other Means, in Violation of the Stark Law.

85.     Relator realleges and incorporates by reference the previous allegations of the Verified Complaint.

### A. The Joint and Several Guaranties of Equipment Leases

86.     The operating agreement applicable to the Physician Investors required them to guaranty certain equipment leases of the Hospital on a pro rata basis based on their ownership percentage in the Hospital. The operating agreement also required them to guarantee the mortgage debt of KMCREI on a capped basis relative to their investment. The Physician Investors did in fact sign personal guaranties on a number of multi-million dollar debt obligations.  However, in violation of the operating agreement, most of these guaranties were not proportional to ownership interest (i.e. a 1% ownership interest should have corresponded to a guaranty of 1% of a lease or loan). Instead, in most cases, the Physician Investors unwittingly signed joint and several personal guaranties with the result that each physician was obligated to pay 100% of a number of multi-million dollar obligations, exposing them to repayment of 100% of the indebtedness, far in excess of their ownership percentages.

87.     The joint and several personal guarantees signed by the Physician Investors absolutely guaranteed the repayment of equipment leases/loans  from The Leasing Group (approx. $3 million), Diversified Equipment Leasing (approx. $4 million), Med One Capital Funding LLC (approx. $1 million), Steris Corporation (approx. $700,000), and Cardinal Health (approx. $500,000). By way of example, Relator wound up with guarantor liabilities of $9,952,727.91, despite his relatively small investment of $40,000.   Every other Physician Investor found him or herself in a similar position.

88.     The Physician Investors gave the personal guaranties as financial accommodations for the benefit of the Hospital and KMCREI.  Through the creditworthiness of the Physician Investors, the guaranties allowed the Hospital and KMCREI to obtain large loans that would otherwise not have been extended. As a matter of law, if the physicians were ever required to fulfill their obligations as secondary obligors, they would have the right to reimbursement form the Hospital under principles of subrogation or indemnity. Thus, the various guaranties placed the Physician Investors into a debt relationship with the Hospital and/or a financial relationship by other means, which provided a strong incentive to make patient referrals.

89.     By their very nature, joint and several guaranties of hospital indebtedness provide an enormous incentive for physicians to refer patients to a hospital to prevent the hospital from defaulting on guaranteed obligations. The Stark law was specifically designed to prevent such financial relationships from creating a captive referral base. However, the Hospital proceeded with soliciting the guaranties from Physician Investors, apparently relying on the whole hospital exception to the Stark Law.

90.     On or about April 28, 2011, the Jefferson Circuit Court entered judgments against the Physician Investors on their joint and several guaranties of the approximately $3 million in Hospital equipment lease debt held by the Leasing Group. As a matter of law, to the extent Leasing Group satisfied these judgments through collections on the Physician Investors, they would have the right to seek reimbursement from the Hospital under principles of subrogation or indemnity.  A number of Physician Investors filed proofs of claim in the Hospital Bankruptcy Case asserting these types of rights.

91.     Thus, from their time of entry in 2011, the Leasing Group judgments placed the physicians into a debt relationship with the Hospital and/or a financial relationship by other means, which provided a strong incentive to make patient referrals, in violation of the Stark Law. These prohibited investment interests did not exist as of December 31, 2010 and therefore could not fall under grandfathering provisions of the Affordable Care Act.

### B.   The RL BB Judgments

92.     As set forth above, in 2011, RL BB obtained huge judgments against the Physician Investors who had signed guaranties of the mortgage indebtedness purchased from BB&T. With respect to Stavens, Hallal and Campbell, these liabilities exceeded seven figures apiece. Upon information and belief, the judgments against those three patient referrals sources remain outstanding to this day. Upon information and belief, the judgments against a number of other Physician Investors remain outstanding.

93.     As a matter of law, if RL BB ever satisfied these judgments through collections on the Physician Investors, they would have the right to seek reimbursement from KMCREI under principles of subrogation or indemnity. A number of Physician Investors filed proofs of claim in the KMCREI Bankruptcy Case asserting these types of rights against KMCREI.

94.     Thus, from their time of entry in 2011, the RL BB judgments placed the physicians into a debt relationship with a financially interdependent affiliate of the Hospital and/or a financial relationship by other means, which provided a strong incentive to make patient referrals to the Hospital, in violation of the Stark Law. These prohibited investment interests did not exist as of December 31, 2010 and therefore could not fall under grandfathering provisions of the Affordable Care Act.

## COUNT I

### PAYING KICKBACKS AND PROVIDING VALUABLE BENEFITS TO INDUCE REFERRALS IN VIOLATION OF THE ANTI-KICKBACK STATUTE AND STARK LAW, WHILE FALSELY CERTIFYING COMPLIANCE IN VIOLATION OF THE FALSE CLAIMS ACT

### (AGAINST THE HOSPITAL, RL BB, RL BB-IN, AND RIALTO)

95.     Relator realleges and incorporates by reference the previous allegations of the Verified Complaint.

96.     The Hospital, Rialto, RL BB-IN and RL BB did knowingly and willfully offer to pay, and/or did actually pay, remuneration directly or indirectly, in cash, equity, or in kind, to Stavens, Hallal, Campbell, and LaRocca in the form of (a) equity in KMCREI; (b) protection from civil suits brought by Relator and other physicians; (c) RL BB's forbearance from pursuing in excess of nine million dollars in judgments it held against Stavens, Hallal, and Campbell; (d) accelerated payments to Hall Robb, which was owned in part by Stavens, Hallal, Campbell, and LaRocca, and certain family members of Stavens and Hallal which, in turn, resulted in releases of agreed judgments against Stavens, Hallal and Campbell; and (e) arranging the settlement of tort claims against Stavens, Hallal, Campbell, and LaRocca.

97.     Such kickbacks, benefits, and remuneration were promised, and/or actually made, to induce Stavens, Hallal, Campbell, and LaRocca to refer and arrange for patients to be sent to the Hospital for services covered under a federal health care program, for which the U.S. would pay in whole or in part under Medicare or Medicaid.

98.     These kickback arrangements did not satisfy the "safe harbor" preconditions included in the Anti-Kickback Statute. As a result, these Defendants all acted in violation of the Anti-Kickback Statute.

99.     In addition, Stavens, Hallal, Campbell, and LaRocca had a financial relationship

25

with the Hospital, mediated and arranged by RL BB, RL BB-IN, Rialto, and Hall Robb, consisting of ownership and/or investment relationships, debt relationships, compensations arrangements, or financial relationships by other means which are prohibited by the Stark Law and do not fall within any exception.

100.    The personal guaranties given by Physician Investors and the resulting personal judgments obtained by Rialto against Physician Investors created a financial relationship with the Hospital which are prohibited by the Stark Law and do not fall within any exception.

101.    Given the strict liability of the Stark Law, any referrals of Medicare patients by Physician Investors to the Hospital, including without limitation Stavens, Hallal, Campbell, and LaRocca, were barred by the Stark Law because of such prohibited financial relationships. The Hospital was aware of these prohibited financial relationships during the time in which it billed the U.S. or services provided to such Medicare patients.

102.    At all times relevant to the Complaint, the Hospital, as a condition of payment, has falsely certified its compliance with the Anti-Kickback Statute and Stark Law to the United States, thereby violating the False Claims Act.

## COUNT II

### CONSPIRACY TO PAY KICKBACKS AND PROVIDE VALUABLE BENEFITS TO INDUCE REFERRALS IN VIOLATION OF THE ANTI-KICKBACK STATUTE AND STARK LAW, WHILE FALSELY CERTIFYING COMPLIANCE IN VIOLATION OF THE FALSE CLAIMS ACT

**(AGAINST THE HOSPITAL, RL BB, RL BB-IN KRE OP, RL BB-IN KRE RE, RIALTO, STAVENS, HALLAL, CAMPBELL, LAROCCA, KMCREI, AND HALL ROBB)**

103.    Relator realleges and incorporates by reference the previous allegations of the Verified Complaint.

104.    The Hospital, RL BB, RLBB-IN KRE OP, RLBB-IN KRE RE, KMCREI, Hall

Robb, Stavens, Hallal, Campbell and LaRocca, each individually agreed to, and entered into a conspiracy with one another to participate in all illegal scheme involving the (a) offering, payment, and acceptance of kickbacks in exchange for, and to induce, patient referrals to the Hospital in violation of the AKS and satisfying no safe harbor conditions; and (b) the creation and sustaining of prohibited financial arrangement to induce patient referrals in violation of the Stark Law and satisfying no exceptions to same.

105.    Each of the above Defendants engaged in one or more overt acts in furtherance of the conspiracy including without limitation participating in, engaging in, facilitating, and expressly or impliedly consenting to the offering, payment and acceptance of kickbacks, compensation, and financial relationships by other means. Such overt acts included the inducement of personal guaranties resulting in personal judgments; the purchase of Hospital debt; the payment of Hospital debt and satisfaction of judgments of creditors; the collection and forbearance from collection of judgments against Physician Investors; the bringing and settling of claims; the formulation of the reorganization plans in the Bankruptcy Cases, and the referral of patients to the Hospital.

**WHEREFORE**, Relator respectfully requests this Court to enter judgment against Defendants as follows:

(a)    That the U.S. be awarded damages against the Defendants, jointly and severally, in the amount of three times the damages sustained by the U.S. because of the false claims and fraud alleged within this Verified Complaint, as the Civil False Claims Act, 31 U.S.C. §3729 et. seq. provides;

(b)    That civil penalties in the maximum amount allowed by law be imposed for each and every false claim that Defendants presented to the U.S. and/or its grantees;

(c)      That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which Relator necessarily incurred in bringing and pressing this case;

(d)      That the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act for which redress is sought in this Verified Complaint;

(e)      That the Relator be awarded the maximum amount allowed to him pursuant to the False Claims Act;

(f)      That this Court award such other and further relief as it deems proper.

## DEMAND FOR JURY TRIAL

Relator, on behalf of himself and the United States, demands a jury trial on all claims alleged herein.

Dated: February 2, 2015

## VERIFICATION

After being duly sworn, I, Abdul Buridi, have knowledge concerning the matters set forth in the foregoing complaint, and do hereby verify, certify, swear, and affirm that the allegations contained in the foregoing complaint are true and accurate to the best of my information, knowledge, and belief.

_____
ABDUL BURIDI

COMMONWEALTH OF KENTUCKY        )
                                )
COUNTY OF JEFFERSON             )

The foregoing Verification was subscribed and sworn to and/or acknowledged before me by ABDUL BURIDI, on this the 2nd day of February, 2015.

My Commission expires on the _18th_ day of _August_, _2018_

_____
NOTARY PUBLIC,
STATE-AT-LARGE, _Kentucky_

MARY HAUSER-LAMB
Notary Public
State at Large
Kentucky
My Commission Expires Aug 18, 2018

29

Respectfully submitted,

_____

Miles S. Apple
APPLE GARDINER CAMOMOT PLLC
6006 Brownsboro Park Boulevard
Suite E
Louisville, KY 40207
Telephone: (502) 882-1338
Facsimile: (502) 805-0546
Miles.apple@applegardiner.com
    *Counsel for Relator, Abdul G. Buridi*