**IN UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **and ABDUL G. BURIDI,** | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No.        4:15-cv-014-SEB-DML |
| **KENTUCKIANA MEDICAL CENTER, LLC** | ) ) ) | **Filed Under Seal Pursuant to 31 U.S.C. § 3729** *et. seq.* |
| **KMC REAL ESTATE INVESTORS, LLC** | ) ) ) | <u>**FIRST AMENDED VERIFIED COMPLAINT**</u> |
| **RL BB-IN KRE OP, LLC** | ) ) | |
| **RL BB-IN KRE RE, LLC** | ) ) | DO NOT PLACE IN PRESS BOX |
| **RL BB FINANCIAL, LLC** | ) ) | DO NOT ENTER ON PACER |
| **RIALTO CAPITAL MANAGEMENT, LLC** | ) ) ) | |
| **HALL-ROBB, LLC** | ) ) | |
| **CHRISTODULOS STAVENS** | ) ) | |
| **ELI HALLAL** | ) ) | |
| **JEFFREY CAMPBELL** | ) ) | |
| **RENATO LAROCCA,** | ) ) | |
| **CARDIOVASCULAR HOSPITALS OF AMERICA, LLC** | ) ) ) | |
| Defendants | ) ) ) | |

1

Relator, Dr. Abdul G. Buridi, M.D. files this First Amended Verified Complaint against Kentuckiana Medical Center, LLC, Rialto Capital Management, LLC, RL BB Financial, LLC, RL BB-IN KRE OP LLC, RL BB-IN KRE RE LLC, KMC Real Estate Investors, LLC, Hall-Robb LLC, Christodulos Stavens, Eli Hallal, Jeffrey Campbell, Renato LaRocca and Cardiovascular Hospitals of America, LLC (collectively "Defendants"), pursuant to the False Claims Act, 31 U.S.C. § 3729 *et seq.* (hereinafter "FCA") to recover damages and civil penalties resulting from false statements and claims that Defendants made or presented, or conspired with other Defendants to make or present, to the United States. The violations arise out of certain Defendants' requests for payment to Medicare and Medicaid (hereinafter, the "U.S.") based on false statements or claims regarding compliance with the Stark Law and Anti-Kickback Statute ("AKS").

## INTRODUCTION

1.      The Hospital has at all relevant times been engaged in the business of operating a full service hospital and filing claims with the U.S. seeking payment for medical services provided at the Hospital.

2.      The Stark Law and AKS violations alleged herein have occurred at various times since 2007 and have continued through the present. These violations have occurred under various guises, at different times, and have involved a number of different corporate and individual actors acting in concert.

3.      As set forth in detail below, four physicians who are or have been key patient referral sources to the Hospital have been knowingly offered and/or provided a variety of kickbacks and valuable benefits for the purpose of inducing referrals to the Hospital.  These physicians also have had, and continue to have, financial relationships with the hospital, through debt relationships, informal and undisclosed compensation arrangements, and other prohibited

means which are per se unlawful.  During the time in which these kickbacks and prohibited financial relationships took place, the hospital filed claims with the U.S. seeking reimbursement for medical services provided under federal health care programs while falsely certifying compliance with the Anti-Kickback Statute and the Stark Law, giving rise to liability under the FCA.

4.      Relator brings this action for violations of the FCA on behalf of himself and the United States of America pursuant to 31 U.S.C. § 3730(b)(1).

5.      As required by the False Claims Act, 31 U.S.C. § 3730(b)(2), the Relator has provided the Attorney General of the United States and the United States Attorney for the Southern District of Indiana, simultaneous with the filing of the original Verified Complaint, a statement of all material evidence and information related to the original Verified Complaint. The disclosure statement is supported by material evidence known to the Relator at his filing, which establishes the existence of Defendants' violations of the FCA.

6.      Further, as required by the False Claims Act, 31 U.S.C. § 3730(b)(2), the Relator has provided the Attorney General of the United States and the United States Attorney for the Southern District of Indiana, simultaneous with the filing of this First Amended Verified Complaint, an amended statement of all material evidence and information related to this First Amended Verified Complaint. The amended disclosure statement is supported by material evidence known to the Relator at this filing, which establishes the existence of Defendants' violations of the FCA.

7.      The fraud and false claims described *infra* occurred at the Hospital in Clark County, Indiana.

8.      At all times relevant hereto, Defendants acted through their agents and employees

and the acts of Defendants' agents and employees were within the scope of their agency and employment. The entity Defendants have at all times acted through their agents in concert and coordination with one another. The actions, policies and practices of the entity Defendants were, upon information and belief, set or ratified by, or pursued in concert and with the active participation of, the individual Defendants named herein.

9.      To the extent, if any, that this case is deemed to be a "related action" and to the extent that any facts set forth herein are deemed to be the same as a fact underlying an existing *qui tam* FCA action pending at the time of filing of this action, as set forth in 31 U.S.C. § 3730(e), said factual allegations in common with any pending action that would cause this case to be a "related action" are hereby expressly excluded from this action, but only to the limited extent necessary to avoid the statutory preemption.

10.      Furthermore, to the extent that any of the allegations or transactions set forth herein are the subject of a pre-existing civil suit or an administrative civil money penalty proceeding in which the United States is already a party, if any such proceedings exist, then the allegations or transactions referred to herein which are the subject of any such civil suit or administrative civil money penalty proceedings are expressly excluded, but only for the specific time periods, specific companies, and/or specific allegations or transactions that were already the subject of such pre-existing civil suit and/or administrative civil money penalty proceeding.

## **PARTIES**

11.      The real party in interest to the FCA claims in this action is the United States of America.

12.      Relator, Abdul G. Buridi ("Relator"), is a resident of Louisville, Kentucky, which is located in Jefferson County, Kentucky.   Relator was one of approximately thirty physician

4

investors in the Hospital and KMC Real Estate Investors, LLC (the "Physician Investors") prior to the emergence of these entities from bankruptcy.  Relator was also a creditor and party in interest in the bankruptcy cases filed by these entities in the United States Bankruptcy Court for the Southern District of Indiana, New Albany Division, Case Nos. 10-93039 and 11-90930 (the "KMC Bankruptcy Cases"), respectively.  Relator filed appeals in the KMC Bankruptcy Cases which resulted in affirmance of the confirmation orders issued in the bankruptcy cases.

13.     Relator is an "original source" of the information set forth herein within the meaning of 31 U.S.C. § 3730(e)(4)(B), and states that his knowledge concerning Defendants' FCA violations has not been publicly disclosed other than as set forth in the appeals in the KMC Bankruptcy Cases.  Prior to the filing of this action, Relator disclosed to the office of the United States Bankruptcy Trustee (the "Trustee") the factual basis of certain Anti-Kickback Statute and Stark law violations alleged herein, in pending bankruptcy cases to which both the Relator and Trustee were parties. The Trustee was on actual notice of these allegations but, upon information and belief, did not investigate or otherwise take action on these allegations.

14.     Defendant,  Kentuckiana Medical Center, LLC (the "Hospital") is a full service general hospital providing, among other things, general surgery, cardiovascular treatment, gastroenterology, infectious disease treatment, neurology, nephrology and urology, with its primary place of business and principal office located in Clark County, Indiana.  The Hospital was originally established as a 49% physician-owned hospital, with the rest of the ownership interests held by Cardiovascular Hospitals of America, LLC ("CHA").

15.     Defendant, KMC Real Estate Investors, LLC ("KMCREI"), is a real estate holding company, with no business or employees, which exists solely to lease office space to the Hospital. Its primary place of business is located in Clark County, Indiana.  KMCREI was originally owned

by certain of the Physician Investors and CHA.

16.     Defendant, RL BB Financial, LLC ("RL BB"), is a Delaware limited liability company with its principal place of business located at 790 NW 107th Avenue, Suite 400, Miami, Florida 33172. Since 2010, RL BB has held and continues to hold a first mortgage on KMCREI's real property. RL BB was the largest secured creditor in the KMC Bankruptcy Cases, and it actively influenced the formulation of the plans of reorganization for the Hospital and KMCREI.

17.     Defendants RL BB-IN KRE OP, LLC and RL BB-IN KRE RE, LLC (collectively "RL BB-IN") are Delaware limited liability companies with their principal places of business located at 790 N.W. 107th Avenue, Suite 300, Miami, FL 33172. Upon information and belief, RL BB-IN OP, LLC served as the Exit Investor in the KMC Bankruptcy Cases. Upon information and belief, RL BB-IN OP, LLC became the 100% equity owner of the Hospital, while RL BB-IN KRE RE, LLC became the 100% equity owner of KMCREI, after they emerged from bankruptcy. RL BB-IN is under common control with its affiliate RL BB. In this complaint, the three entities will for convenience sometimes be referred to collectively as "RLBB."

18.     Defendant, Rialto Capital Management, LLC ("Rialto"), is a Delaware limited liability company, with a principal place of business located at 790 NW 107th Avenue, Suite 400, Miami, Florida 33172. At all times, Rialto actively participated in formulating the plans of reorganization in the KMC Bankruptcy Cases through its ownership and control of RL BB and/or RL BB-IN.

19.     Rialto is a dealer in massive pools of distressed loans. It services such loans and packages them as marketable securities.[1] It was reported in 2012 that Rialto had paid an average

---

[1] For example, in a transaction underwritten by JP Morgan Chase & Co., issued bonds supported by a portfolio containing similar non-performing loans. Al Yoon, "JP Morgan Revives Sales of Distressed-

of 43 cents on the dollar for these loans.[2]  Rialto has been the beneficiary of billions in taxpayer dollars. As reported by the Special Inspector General for the Troubled Asset Relief Program (SIGTARP), Rialto was the sub-advisor to one of only eight fund managers granted the special privilege to receive matching investments from the federal government to finance massive acquisitions of legacy commercial mortgage backed securities.[3] The rates of return on these investments have been exorbitant.[4]

20.     Defendant, Hall-Robb, LLC ("Hall Robb"), is an Indiana limited liability company, with its principal place of business located at 109 Brandywynne Lane, New Albany, IN 47150. Hall-Robb was a creditor and active participant in the KMC Bankruptcy Cases. Hall Robb has at all relevant times been majority owned and/or controlled by Stavens, Hallal, Campbell, LaRocca, and family members and colleagues of Stavens and Hallal.

21.     Defendant, Eli Hallal ("Hallal"), is an individual residing at 109 Brandywynne Lane, New Albany, Indiana 47150.  Hallal is a present Director of KMCREI and one of the top referring doctors to the Hospital. Hallal presently provides services to the Hospital in exchange for monetary compensation. Prior to the KMC Bankruptcy Cases, Hallal was a member of the Hospital Board and a controlling person of the Hospital.

---

Commercial-Mortgage Bonds," *4-Traders*, 03/29/2012 (available at 4-Traders.com); Sarah Mulholland, "JP Morgan, Wells Fargo Said to Offer $132 Million Rialto CMBS," March 29, 2012, *Bloomberg.com*; Max Adams, "JP Morgan Non-Performing Deal Flies Off Shelf," April 13, 2012, *Realestatefinanceintelligence.com*.

[2] See Yoon, above.

[3] Office for the Special Inspector General for the Troubled Asset Relief Program, Quarterly Report to Congress, July 21, 2009, "PPIF Manager Selection," p. 87

[4] Office for the Special Inspector General for the Troubled Asset Relief Program, Quarterly Report to Congress, July 25, 2012, Table 2.38, p. 139.

22.     Defendant, Christodulos Stavens ("Stavens"), is an individual residing at 1235 Forest School Lane, Anchorage, Kentucky 40223.  Stavens is a Director of KMCREI and one of the top referring doctors to the Hospital. Stavens presently provides services to the Hospital in exchange for monetary compensation. Prior to the KMC Bankruptcy Cases, Stavens was a member of the Hospital Board and a controlling person of the Hospital.

23.     Defendant, Renato LaRocca ("LaRocca"), is an individual residing at 2201 Goshen Lane, Goshen, Kentucky  40245.  LaRocca is a Director of KMCREI and one of the top referring doctors to the Hospital. Prior to the KMC Bankruptcy Cases, LaRocca was a member of the Hospital Board.

24.     Defendant, Jeffrey Campbell ("Campbell") is an individual residing at 1902 Arnold Palmer Boulevard, Louisville, Kentucky  40245.  Campbell is a Director of KMCREI and one of the top referring doctors to the Hospital. On or about April 23, 2014, it was reported that Campbell was an owner of Physicians Primary Care, a medical practice which was raided by federal agents in connection with a federal investigation involving prescriptions of controlled substances.

25.     Defendant, Cardiovascular Hospitals of America, LLC ("CHA"), is a Delaware limited liability company, with its principal place of business located at 9340 E. Central Avenue, Wichita, Kansas 67206.  CHA was the majority owner of the Hospital and a creditor and active participant in the KMC Bankruptcy Cases.  In exchange for its role in developing the hospital project, CHA received from the hospital construction loan proceeds a development fee which it used to fund most of its equity investment in the project. CHA also provided management services, including healthcare legal compliance, to the Hospital.


**JURISDICTION AND VENUE**

26.     This Court has subject matter jurisdiction over this case pursuant to 31 U.S.C. § 3730(b), which allows a private person to bring suit for a violation of the FCA; pursuant to 28 U.S.C. § 1345, which provides the District Courts with original jurisdiction over all civil actions commenced by the United States of America; and pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States.

27.     The acts proscribed by 31 U.S.C. § 3729 *et seq*. and complained of herein were performed by the Defendants who transact business and/or reside in the Southern District of Indiana. Therefore, this Court has personal jurisdiction over defendants, and venue is proper in this district, pursuant to 31 U.S.C. § 3732(a). Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## STATUTORY AND REGULATORY BACKGROUND

### I.     The False Claims Act

28.     Relator's claims are brought pursuant to the FCA, 31 U.S.C. §§ 3729–33. Generally speaking, the FCA authorizes private citizens to bring actions on behalf of the federal government to recover amounts that were paid by the U.S. for false claims that were submitted with knowledge that the claims were false. 31 U.S.C. §§ 3729(a), 3730(b).  False claims include any claims that falsely certify compliance with the Stark Law and the AKS, when the filer in fact was acting in violation of, or with knowledge of violation of, such laws. *See, e.g., U.S. ex rel. Kosenske v. Carlisle HMA, Inc.*, 554 F.3d 88, 94 (3d Cir. 2009).

29.     Failure to disclose violations of the Stark Law and AKS when submitting claims to the United States constitute material omissions under the FCA.  See *United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008).

## II.     <u>The Anti-Kickback Statute</u>

30.     The AKS generally prohibits kickbacks or other payments made to induce or reward the referral or generation of federal health care business. 42 U.S.C. § 1320a–7b(b)(2)(A).

31.      The AKS makes it a crime to knowingly and willfully offer, pay, solicit or receive any remuneration to induce a person (1) to refer an individual to a person for the furnishing of any item or service covered under a federal health care program; or (2) to purchase, lease, order, arrange for or recommend any good, facility, service, or item covered under a federal health care program. 42 U.S.C. § 1320a-7b(b)(l) and (2).

32.     The term "any remuneration" includes anything of value and broadly encompasses any kickback, bribe, or rebate, direct or indirect, overt or covert, cash or in kind. 42 U.S.C. §1320a-7b(b)(1). Federal courts have held that the AKS is violated where *one purpose* of the remuneration is to induce referrals, even if other legitimate business purposes exist. *See United States v. Greber*, 760 F.2d 68, 71-72 (3d Cir. 1985); *United States v. Kats*, 871 F.2d 105, 108 (9th Cir. 1989); *United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998); *United States v. McClatchey*, 217 F.3d 823, 835 (10th Cir. 2000); *United States v. Borrasi*, 639 F. 3d 774, 782 (7th Cir. 2011)

33.     Recent amendments to the Anti-Kickback Statute have eliminated the need for a person to have "actual knowledge … or specific intent to commit a violation" of the Statute. 42 U.S.C. § 1320a–7b(h).

34.     In 2010, Congress specifically amended the AKS such that "a claim that includes items or services resulting from a violation of [AKS] constitutes a false or fraudulent claim for the purposes of [FCA]" 42 U.S.C. §1320a-7b(g) (*clarification added*). Thus a violation of the Anti-Kickback Statute – even if the service or item was medically necessary, provided, and appropriately billed – constitutes a per se violation of the FCA.

### III.     The Stark Law

35.     To the same end, the Stark Law prohibits a hospital (or other entity providing health care items or services) from submitting Medicare claims for payment based on patient referrals from physicians having a "financial relationship" with the hospital, unless an enumerated exception applies. 42 U.S.C. § 1395nn.

36.     Under the Stark Law, a financial relationship exists where a physician has a direct or indirect ownership or investment interest in, or compensation arrangement with, an entity which provides designated health services. 42 U.S.C. § 1395nn(a)(2); 42 C.F.R. § 411.354(a)(1)(ii).

37.     A prohibited ownership or investment interest may be through "equity, debt, or other means," and it includes an interest in any entity that holds an ownership or investment interest in any other entity providing the designated health service. *Id.* A "compensation arrangement" can be "any arrangement involving remuneration, direct or indirect, between a physician ... and an entity." 42 C.F.R. § 411.354(c). "Remuneration," is defined under the Stark Act as "any remuneration, directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. § 1395nn(h)(1)(B).

38.     The Stark Law is a strict liability statute. If an otherwise prohibited financial relationship does not meet an exception, every referral made by the physician with such relationship is considered a prohibited referral.

39.     The Stark Law forbids payment of any claim that arises from medical services rendered to a patient who had been referred improperly.  *United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008).


## FACTUAL ALLEGATIONS

### I.     Rialto Has Caused the Hospital to Provide Kickbacks and Valuable Benefits To Physicians to Induce Referrals and Thereby Advance Its Financial Interest In The Hospital.

40.     Relator realleges and incorporates by reference the previous allegations of the First Amended Verified Complaint.

41.     In 2007, the approximately thirty Physician Investors purchased membership interests in Kentuckiana Investors, LLC, which owned 49% forty-nine percent of the Hospital. In connection with their investment in the Hospital, the physicians were required by their operating agreement to guaranty a share, in proportion to their ownership percentages, of the Hospital's and KMCREI's obligations to creditors.

42.     The planned 60 bed hospital was never completed and a 34 bed building opened in a severely undercapitalized state, with only ten beds operational initially. No more than 26 beds were ever operational and there was no emergency room. Unable to generate sufficient revenue to operate and pay its bills, the Hospital quickly became insolvent.

43.     Soon the Hospital had defaulted on its multi-million dollar obligations to First Tennessee Bank, its primary secured lender, and various other lessors of very expensive medical equipment used by the Hospital. The physicians were sued on their personal guaranties.

44.     On September 9, 2010, the Hospital voluntarily commenced its Chapter 11 bankruptcy case in the United States Bankruptcy Court for the Southern District of Indiana, New Albany Division, Case No. 10-93039 (the "Hospital Bankruptcy").

45.     Since the Hospital could not pay its rent, its landlord KMCREI was also struggling financially and soon defaulted on its $21.5 million dollar construction loan. After the default, BB&T sold this loan and the associated personal guarantees at a discount to RL BB.

46.     Rialto thereafter caused RL BB to institute a foreclosure proceeding against KMCREI in Clark County, Indiana.

47.     On April 1, 2011, KMCREI filed its own bankruptcy case in the Southern District of Indiana, New Albany Division, Case No, 11-90930.  The KMCREI Bankruptcy Case stayed the foreclosure proceeding (the "KMCREI Bankruptcy").

48.     For about two years, the Hospital and KMCREI proposed various plans to emerge from bankruptcy, none of which came to fruition due to the lack of a financial commitment from a new investor which would be willing and able to infuse new capital necessary to complete the construction of the Hospital. RL BB had initially opposed the proposed plans of reorganization due to what it saw as unfavorable treatment of its mortgage debt. Eventually Rialto decided that it would become the new owner of the Hospital through its affiliates.

49.     Specifically, in June of 2013, RL BB-IN OP, LLC, as Exit Investor, agreed to finance both the Hospital's and KMCREI's exit from bankruptcy under new proposed plans of reorganization which were approved later that fall.

13

50.     Under the Hospital's Third Amended Plan of Reorganization dated June 14, 2013 (as amended, the "Hospital Plan"), the Exit Investor would own 100% of the equity in the Hospital.

51.     KMCREI's Third Amended Plan of Reorganization, also dated June 14, 2013 (as amended, the "KMCREI Plan"), provided for the restructuring of RL BB's $21.5 million secured loan and cash payment of $538,573.79 to Clark County, Indiana, to satisfy past due real estate taxes.

52.     Due to its assumption of a 100% ownership interest and its required capital investment in the Hospital and KMCREI, Rialto gained a much larger and more direct interest in the Hospital's financial success than it had previously had as merely a mortgage note holder.

## A.    <u>The Hospital and Rialto Offer Referring Doctors Twenty Percent of the Equity of KMCREI as a Kickback to induce continued referrals.</u>

53.     KMCREI's Plan contained the following provision:

The remaining 20% of new membership interests in the Debtor [KMCREI] shall include voting and distribution rights, and shall be issued to Dr. Christodulous Stavens, Dr. Eli Hallal, Dr. Jeffrey Campbell and Dr. Renato LaRocca in consideration of their ongoing commitment to the hospital and their importance to the feasibility of this Plan and the [Hospital] Plan."

*KMCREI Plan*, at Section 8.4 (*clarification added*).

54.     Thus, KMCREI's Plan, which is recognized in bankruptcy law to be contractual in nature, explicitly offered to pay membership interests to Drs. Stavens, Hallal, Campbell and LaRocca.

55.     Relator objected to the KMCREI Plan under the absolute priority rule, among other issues. The absolute priority rule prohibits insiders/investors being given equity without new value being given by such insiders/investors. Section 1129(b)(2)(B)(ii) of Title 11 of the United States

Code. This issue was taken up by the bankruptcy court at the hearing to consider the confirmation of the plans.

56.     When asked at the hearing what new value these physicians were giving to KMCREI, the Hospital's counsel stated that "the new value that's being provided by these four docs to this hospital, these four docs provide 75 percent of the admissions to [the Hospital] which in fact is then going to pay rent to KMCREI so the building doesn't get foreclosed on."

57.     Testimony at the confirmation hearing confirmed that referrals from Stavens, Hallal, Campbell and LaRocca accounted for 70-80% of the admissions to the Hospital.

58.     The Hospital's counsel further argued:

And as a practical matter Rialto is going to end up with 100 percent ownership and ultimately transfer 20 percent of their ownership interest to these four doctors. All this amendment was doing is saying, look, we're trying to have full disclosure here, we're not trying to play hide the ball. That ultimately the end result is 80 percent Rialto, 20 percent the docs.

59.     The evidence adduced at the hearing confirmed that a primary purpose of the KMC and KMCREI Plans was to induce four key referral sources to continue making referrals by offering them a 20% stake in KMCREI, so as to ensure the financial success of the Hospital and, derivatively, to benefit Rialto.

60.     As recently as February 23, 2015, Rialto has valued the real property that comprises KMCREI at $34,789,000.   Assuming that valuation is correct, twenty percent of $34,789,000 constitutes $6,957.800, which is real and valuable remuneration from Rialto to these four key referral sources.

61.     With respect to the twenty percent interest in KMCREI, the four referring doctors, Stavens, Hallal, Campbell and LaRocca each would receive an equal share.   Said another way,

Stavens would receive five percent, Hallal five percent, Campbell five percent, and LaRocca five percent.

62. The award of equity was purportedly made in exchange for the agreement by these physicians to reduce their allowed administrative claims against the bankruptcy estate, which varied significantly in amount, by 50%. The purported basis for the administrative claims consisted of, among other things, unpaid Hospital salary and the provision of thousands of hours of unpaid 12 and 24 hour call shifts at the Hospital during the bankruptcy.

63. Since the filing of the original Verified Complaint, Stavens testified that he did not negotiate for his equity interest in KMCREI and that the decision to award him this interest was made without his involvement.

64. Based on testimony given after the filing of the original Verified Complaint, the twenty percent equity interest has not yet been paid but the offer of equity has not been rescinded and there remains an expectation of payment.

65. The above conduct violates the AKS and/or the Stark law because the referring doctors were offered, and accepted the offer of, equity the payment was which was intended to, and did, induce patient referrals to the Hospital.


**B. The Hospital and Rialto Arrange for an Injunction Designed to Protect Referring Doctors from Multiple Lawsuits as another Kickback.**

66. A key part of the Hospital Plan was a proposed injunction which would preclude the Hospital's many secured creditors from pursuing Physician Investors on their personal guaranties as long as such creditors were being timely paid through the Plan. The injunction addressed the fact that the Physician Investors, over the preceding two years, had faced a wave of

creditor lawsuits, resulting in millions of dollars in collections, harassing collection efforts, burdensome legal fees, and in many cases personal bankruptcies.[5]

67.     At the time the Plans were being proposed, Relator was engaged in hard-fought and expensive state court litigation involving Hallal, Stavens, Campbell, and LaRocca.  Relator's derivative lawsuit against Stavens and Hallal dated back to 2011 and alleged, among other things, theft of hundreds of thousands of Physician Investor funds. Recently, Relator obtained a 12 person jury verdict against Stavens and Hallal for conversion of investor funds (unanimous) and fraudulent misrepresentation in connection with his personal guaranties of equipment leases.  A final judgment has been entered and a motion for a new trial has been denied. A post-judgment motion by the Relator to modify the judgment to add pre-judgment interest remain pending as of the filing of this First Amended Verified Complaint.

68.     In response to another lawsuit filed by Hall Robb against Relator and others to enforce their personal guaranties of the First Tennessee indebtedness purchased by Hall Robb,[6] Relator and his co-defendants counterclaimed against Hallal, Stavens, Campbell, and LaRocca alleging abuse of process.

69.     At the time Hall Robb sued on the guaranties, at least one other Physician Investor had in the preceding year obtained six figure judgments against Stavens and Hallal to enforce their indemnity obligations. Other Physician Investors were considering bringing similar claims against Stavens and Hallal.

---

[5] In the midst of the chaos and stress from the onslaught of collection activities, marriages were broken and one physician even suffered a fatal heart attack.  Two doctors even filed their own individual bankruptcies and forced to defend 11 U.S.C 523 Adversary Proceedings brought by several of the Defendants.

[6] The Hall Robb transactions is discussed in further detail, *infra*, at subsection d.

70.     In order to protect Hallal, Stavens, Campbell, and LaRocca from having to defend against Relator's and other physicians' lawsuits, as detailed above, and to deter others from pursuing claims, the Hospital and Rialto proposed an eleventh hour amendment to the Hospital Plan to include the following provision:

> Notwithstanding anything in this Confirmation Order and in Article XI of the Plan to the contrary, in the event that any guarantor or any co-obligor of the Debtor either (a) becomes a debtor under title 11 of the U.S. Code or (b) *commences or continues any action against* the Debtor, KMCREI, or *any equity holder in the reorganized Debtor or KMCREI*, then the injunctions set forth in this Confirmation Order shall automatically terminate and shall not apply to such guarantor or such co-obligor and/or their property

*Amended Plan*, Section 9, pg. 11 (emphasis added).

71.     As set forth in the KMCREI Plan, Hallal, Stavens, Campbell, and LaRocca were to become twenty percent equity holders in the reorganized KMCREI. Thus, under the express language added to the injunction provision at the last minute, any Physician Investor who pursued any claims against these select individuals would lose the valuable protections of the injunction against creditors and would once again be exposed to the risk of aggressive collection efforts on their personal guaranties.

72.     The new language was intended to, and did in fact, deter Physician Investors from continuing to pursue claims against Hallal, Stavens, Campbell, and LaRocca, resulting in valuable benefits to these four individuals. In other words, the Hospital Plan developed by the Hospital and Rialto offered a second valuable benefit – shelter from then-pending and future civil suits – to the same four doctors whose referrals made up 70-80% of patient admissions as an inducement for them to continue referring patients at the same or similar rate.

**C.   Rialto Forbears From Collection Efforts on RLBB's Huge Judgments Against Referring Doctors**

73.     The 2010 bankruptcy filings by the Hospital and KMCREI protected these entities from creditor's lawsuits as a result of the automatic stay.  The automatic stay did not extend to creditor claims against the Physician Investors who were forced to defend multiple legal actions to enforce their personal guaranties.  Some declared bankruptcy, others settled for large sums, still others defended the suits at great personal expense.

74.     In 2011, RL BB followed other creditors by filing an action against Relator and the other physicians to enforce their personal guaranties.

75.     On August 2, 2011, the court entered a summary judgment in favor of RL BB and against the Physician Investors to enforce their personal guaranties of the BB&T mortgage loan acquired by RLBB.  Final judgment was entered on the guaranties on September 8, 2011.

76.     The total amount due to RL BB at the time of judgment was $20,606,597.77. Hallal was adjudged to owe RL BB $4,099,534.00. Stavens was adjudged to owe RL BB $3,781,544.00. Campbell was adjudged to owe $1,075,000.00. Together, the three were adjudged to owe RL BB $8,956,078.00, or almost half of the entire amount due to RL BB. No physician investor owed RL BB more than Stavens and Hallal owed.

77.     RL BB immediately commenced extremely aggressive collection efforts on these judgments, including all the usual post-judgment remedies plus tactics to induce settlement by the Physician Investor such as noticing depositions of spouses and sending the sheriff to their homes. Certain Physician Investors were selected as targets to receive the brunt of the collection efforts. A number of these Physician Investors ultimately gave up and elected to settle with RL BB.  Upon information and belief, the aggregate settlement amounts totaled more than seven figures.

78.     Although RL BB initially pursued Stavens and Hallal on their judgments, it eventually ceased any collection efforts against them, despite the fact that they had by far the

largest judgments against them. Since they were referring patients to the Hospital, RL BB obviously knew how to find and garnish them but simply chose not to do so. RL BB's decision to forbear from further settlement efforts against Stavens and Hallal coincided with Rialto's business decision to become an owner of the Hospital rather than simply a creditor. That business decision required good relations with Stavens and Hallal due to their critically important role as patient referral sources. Upon information and belief, Campbell also received preferential treatment in regard to judgment enforcement efforts. Upon information and belief, Stavens, Hallal, and Campbell have not paid amounts on their judgments (if any) which are material in relation to the amounts owed and/or have not paid amounts reasonable in relation to what other non-referring Physician Investors have been forced to pay.

79. In short, RL BB has provided forbearance from collection activities on almost nine million dollars of debt as an inducement to Hallal, Stavens, and Campbell to continue to refer patients to the Hospital.

80. On information and belief, other Physician Investors struck deals with Rialto and its agents to receive forbearance on collection of individual judgments against them in exchange for the Physician Investors' services and to serve as a source of referrals.

81. Under the Plans, the noticeable exception to the injunction against creditor collection efforts was that RL BB would not be subject to the injunction and would be free to continue collection efforts against the Physician Investors. Therefore, even post-bankruptcy, RL BB's voluntary forbearance from pursuing millions of dollars of judgments against these referral sources has continued to provide value remuneration to them.

82. Additionally, on or about November 22, 2013, a few months after the KMC Plan was approved, RL BB released its judgment lien on Stavens' personal residence, thus removing

encumbrances to its sale or mortgage. Similarly, in late 2013, after the KMC Plan had been approved, both Hall Robb and the Leasing Group also released their judgment liens on Stavens' personal residence. These releases were given before either entity had been paid what it was owed under the KMC Plan. By contrast, the judgments held by these entities against rank-and-file Physician Investors such as Relator were not released until well into 2014 after they had been paid in full.

83.    On information and belief, other referring Physician Investors have been offered, and have accepted and received, forbearance on judgments in exchange for and to induce the referral and/or provision of services to the Hospital.

84.    Upon information and belief, no such accommodations have been forthcoming to the non-referring Physician Investors against whom RL BB has obtained judgments and filed judgment liens.

85.    Since the inception of the Hospital, Relator has not referred one case to or performed any services for the Hospital for fear of Stark Law violations.  In turn, Relator remains subject to a wage garnishment, has paid tens of thousands of dollars to RL BB, and has had to repulse RL BB's efforts to seize his medical practice.

86.    As of the filing of this First Amended Verified Complaint, Relator has paid over $189,000 to RL BB under the wage garnishment.

87.    Upon information and belief, some referring Physicians Investors have been threatened by Defendants with vigorous collections efforts should they cease to provide services or referrals to the Hospital.

88.    On information and belief, Defendants' threats are primarily directed against non-referring Physicians for failing to provide referrals to the Hospital.

89.     Upon information and belief, while forbearing from collecting upon Stavens, Hallal, and other physician investors who still owe Rialto large sums of money, Rialto has continued to garnish the Relator in retaliation for his public allegations – made in the Hospital Bankruptcy and the KMCREI Bankruptcy (and to the U.S. Trustee) – that awarding real estate to Stavens and Hallal was a violation of the Stark Law and/or False Claims Act.

### D.  Rialto and the Hospital Work to Ensure that Hospital Debt Held Indirectly By Referring Doctors Is Paid Quickly And Completely

90.     Hall Robb is an Indiana limited liability company formed on May 12, 2009 with only two initial members: Hallal and Hallal's wife's cousin, Phil Robertson. The name of the company is a combination of the two men's last names. Pursuant to Hall Robb's operating agreement, Hallal was designated the initial manager. Hallal testified in a deposition given in 2011 in the Hospital Bankruptcy Case that he and Robertson ran Hall Robb.  As late as the fall of 2013, Hallal was designated by Hall Robb under Civil Rule 30(b)(6) to give binding testimony on behalf of the company in its lawsuit to enforce personal guaranties of certain Physician Investors.

91.     In 2010, when the Hospital started to fail, First Tennessee Bank initially emerged as the most aggressive creditor.  First Tennessee almost immediately filed an action in Clark County, Indiana Circuit Court (Case  Number  10001-1007-MF-001312) against the Physician Investors on their personal guaranties, and it had a lien on the Hospital's accounts receivable.

92.     At the behest of Stavens and Hallal, Hall Robb was initially presented to the Physician Investors as a white knight to purchase the Hospital debt held by First Tennessee. On or about January 19, 2011, Hall Robb purchased the First Tennessee indebtedness for $2,550,000, a steep discount off the approximate $5,000,000 face amount of the note.  As of the purchase, Hallal, Stavens, Campbell, LaRocca, and members of their families collectively owned at least 87.04% of Hall Robb.

22

93.     At the time Hospital was first established, the "whole hospital exception" to the Stark Law allowed physicians to have ownership or investment interests in a general acute care hospital to which they referred patients. This was effectively ended by the Affordable Care Act in 2010, subject to conditional grandfathering with respect to physician ownership or investments in hospitals which existed as of December 31, 2010. *See* 42 U.S. Code § 1395nn(a), (d), (i)(1)(A).

94.     To the extent that these four doctors were responsible for 70-80% of patient admissions to the Hospital, their indirect debt relationship with the Hospital through Hall Robb was an obvious Stark Law violation because this investment interest in secured debt of the Hospital did not exist as of December 31, 2010, as required under the 2010 Stark Law amendments.

95.     Furthermore, the 2010 Stark Law required that previously existing physician-owned hospitals maintain the same percentage of the total value of the ownership or investment interests held in the hospital as of March 23, 2010.

96.     As noted above, Hall Robb, through its purchase of First Tennessee debt, still held the primary security interest in the assets of Hospital.  Under 42 CFR 411.354(b), Stavens, Hallal, Larocca, Campbell and their family members' ownership of Hall Robb would constitute an additional ownership or investment interest in the Hospital, materially changing the percentage of the value of the ownership or investment interest in the Hospital. Upon information and belief, the Hospital and the four referring doctors also failed to make the legally required disclosures of their investment interest in the Hospital through Hall Robb, as required under the 2010 Stark law amendments. *See* 42 U.S. Code § 1395nn(i)(1)(A).

97.     The purchase of the First Tennessee debt by Hall Robb in early 2011 temporarily halted collection efforts on the First Tennessee guaranties and took some pressure off the Hospital. Soon thereafter, Hall Robb took agreed judgments against eleven Physician Investors who were

defendants in the Clark County lawsuit. These included judgments against Stavens ($1,905,174.13); Hallal ($2,160,099.13); Campbell ($1,011,699.13); and LaRocca ($782,761.13). A key motivation for the agreed judgments was the belief that they would hinder other creditors by allowing Hall Robb, a purportedly friendly creditor, to serve as a "firewall." The firewall proved to be legally flawed and ineffective. Not only did it fail to slow down other creditors, but it resulted in Hall Robb having a legal right to enforce large judgments against any Physician Investor foolish enough to voluntarily agree to one.

98.     Hall Robb ultimately turned against the Physician Investors and began to enforce agreed judgments against those who were not also equity owners of Hall Robb. Hall Robb also began to pursue enforcement of the First Tennessee guaranties signed by the Relator and five other Physician Investors who were perceived as hostile to the Bankruptcy reorganization efforts and allied with Buridi against Stavens and Hallal. *See Hall Robb, LLC v. Buridi, et al.*, Jefferson Circuit Case Number 13-CI-03296.

99.     The indebtedness held by Hall Robb was eventually addressed through the KMC Bankruptcy. As eventually approved in October 2013, the Hospital Plan called for the Exit Investor to provide funds necessary to pay the secured creditors of the Hospital. Among these payments to be made by the Hospital was the payment of approximately $5,000,000 to Hall Robb on the note it had acquired for $2,550,000. This amount was to be paid over several years under the terms of a new promissory note.

100.     As such, despite the Hospital Plan's proposal to wipe out the equity ownership of Physician Investors in the Hospital, Stavens, Hallal, Campbell, LaRocca and their respective family members still had an ownership and investment interest in the Hospital, even after the Plan was substantially consummated.  As such, even though Rialto implemented the Hospital Plan in

November of 2013, the Hospital was still a physician-owned hospital subject to the same statutory requirements imposed on physician-owned hospitals.

101.     Hall Robb did not have to wait until the due date for payment under the Hospital Plan. The amounts owed by the Hospital on the Hall Robb note were paid in advance of that due date. Upon information and belief, this occurred sometime in the latter half of 2014, less than a year after confirmation. This payment retired the original First Tennessee indebtedness and required Hall Robb to drop its claims against the Relator and his five co-defendants in the Jefferson Circuit Court action.   At the behest of Rialto, Hall Robb negotiated for the dismissal of the counterclaims against Hallal, Stavens, Campbell, and LaRocca.   Upon information and belief, these referring doctors did not pay anything to settle the claims against them and were included in the release as a gratuity.

102.     Thus, the Hospital and Rialto arranged for remuneration, in the form of valuable benefits to investors in Hall Robb receiving benefits by (1) causing their investment vehicle, Hall Robb, to receive accelerated payment of its promissory note and by causing the counterclaims against these four referring doctors to be dismissed and (2) causing Hall Robb's huge agreed judgments against Stavens, Hallal, Campbell and LaRocca to be satisfied.

103.     Since the time that Rialto ascended to the role of ultimate Hospital owner, it has, in concert with the Hospital, RL BB, and RL BB-IN, engaged in a persistent pattern of conduct designed to protect and reward the Hospital's key patient referral sources, including by (1) offering them equity in KMCREI; (2) providing them protection from lawsuits brought by Physician Investors and helping to settle such lawsuits; (3) forbearing from enforcing RL BB's own multi-million judgments against them; and (4) pre-paying indebtedness held indirectly by them through Hall Robb, which also had the effect of satisfying judgments against them.

104.    These benefits were intended to, and did, serve as an inducement to Hallal, Stavens, Campbell, and LaRocca to continue to provide referrals accounting for 70-80% of the Hospital's patient admissions, in violation of the AKS. These benefits also constitute a prohibited debt relationship and/or compensation arrangement in violation of the Stark Law. As a result of the accelerated repayment of the Hall Robb note, Rialto and the Hospital addressed the existing Stark Law violation arising from Hall Robb's investment interest in the Hospital, but in doing so merely created a new Stark Law violation based on the provision of valuable benefits to the referring physicians.

II.    **Over the Course of the Bankruptcy, CHA, Stavens, Hallal, and Campbell, Through Their Control of the Hospital, Violated The Stark Law, AKS and Other Healthcare Laws for Their Own Benefit and to the Detriment of Patient Safety.**

105.    Relator realleges and incorporates by reference the previous allegations of the First Amended Verified Complaint.

106.    As mentioned above, CHA was the majority owner of KMC, held 4 of the 9 seats on the Board of Directors and was also party to a Management Agreement with the Hospital.

107.    As a majority owner of the Hospital, CHA had a strong financial incentive to increase Physician Investor referrals to the Hospital in order to ensure the financial success of the Hospital, and derivatively, to benefit CHA.

108.    CHA, with a significant number of seats on the Board of Directors, had significant control over the management of the Hospital. CHA, Stavens and Hallal typically aligned themselves together on Hospital issues with the consequence that they constituted a majority voting block.

109.     Under its Management Agreement, CHA was also responsible for maintaining the facilities of the Hospital and ensuring compliance with various healthcare laws and regulations, including the Stark Law and AKS.

110.     On information and belief, from its inception, the Hospital's healthcare compliance regime suffered from serious lapses.  While classified as an acute care hospital, the Hospital's staffing and equipment was inadequate, and continued to remain inadequate throughout the course of the bankruptcy, to maintain such a facility.  For example, the Hospital did not have regular 24 hour on-call physicians overseeing the Hospital's acute care patients, did not even have the medical equipment necessary to allow physicians to perform many basic procedures on its patients such as a pulmonary function laboratory, and failed to have physicians available for essential services such as infectious disease prevention and critical care.

111.     Part of the reason for the failure to have adequate staffing and equipment was that this Hospital was originally envisioned as a cardiac specialty hospital.  However, when Congress and CMS imposed a moratorium on physician-owned specialty hospitals, Stavens and CHA re-invented the Hospital as a general acute care hospital so that they could purportedly fit it within the "whole hospital" exception for physician-owned hospitals under the Stark Law.

112.     However, the Hospital that resulted after several years of planning failed to even provide the necessary services and equipment for a licensed specialty hospital, much less for a general acute care hospital.

113.     For example, at inception, the Hospital did not have an echocardiogram machine or ultrasound or nuclear camera, machines necessary for cardiac treatment and diagnosis.

114.    Relator raised this issue with the Hospital's Board of Directors at a meeting of the Physician Investors in 2010.  He was told that the Hospital did not have the funds to buy an echo-cardiogram machine or technician to operate it.[7]

115.    Because the Hospital lacked much of the basic equipment and staff to effectively run an acute care hospital many of the Physician Investors did not refer their patients to the Hospital.  However, Stavens, Hallal and Campbell did, in fact, refer their patients to the Hospital despite the inadequacy of its services, and they pressured others to do so as well.

116.    At meetings of the Physician Investors, CHA, through its representatives, berated the Physician Investors for their failure to refer patients to the Hospital.  They stated that in order for the Hospital to be successful, the Physician Investors would need to refer more of their patients to the Hospital to fill all available beds.  CHA also told that the gathering that they needed to be "more like Stavens and Hallal."  If they did not, according to CHA's representative, the Hospital would never be profitable.

117.    The Hospital, through its compliance agent, CHA, never conducted proper procedure to allowing awareness of the requirements of disclosure of physician ownership interests as required to maintain the compliance with the "whole hospital" exception under the Stark Law.

118.    Conversely, on information and belief, the Hospital, through its compliance agent, CHA, and its management Stavens and Hallal never took proper steps to inform patients that some of the services rendered by the Hospital may be performed by Physician Investors of the Hospital as required to maintain compliant with the "whole hospital" exception under the Stark Law.

119.    At these meetings, Stavens, as Chief Executive Officer of the Hospital, and Hallal, as Chief Medical Officer of the Hospital, along with CHA, continued to cajol, threaten and

intimidate Physician Investors into referring patients to the Hospital in direct violation of the Stark Law.

120.    One Physician Investor even voiced concerns with the Board stating that the issuance of such directives by the management of the Hospital crossed the line imposed by the Stark Law.   Such responses were met with contempt by the Hospital's management and its contractual compliance agent, CHA.

121.    Campbell, also a member of the Board, even sent an email to the Physician Investors stating that they needed to set aside their concerns with the lack of services at the Hospital and just send more patients to the Hospital.   Otherwise, he stated, the Physician Investor would be forced to go out of pocket  to make more capital contributions.

122.     On information and belief, during this time, due to the lack of funding, staffing and medical equipment, patient care and safety suffered.

123.    The problems became more acute once the Hospital filed for bankruptcy.

124.    On October 10, 2010, the Hospital filed with the Bankruptcy Court a Motion to Waive the Appointment of a Patient Care Ombudsman.   Under 11 U.S.C. Section 333, the Bankruptcy Code requires the U.S. Trustee appoint a patient care ombudsman to makes sure that patient care does not suffer during a healthcare facility bankruptcy.   However, the Hospital moved to waive the appointment under "the non-exclusive factors articulated in *In re Alternate Family Care,* 377 B.R. 754, 758 (Bankr. S.D. Fla. 2007)."   In the Motion, the Hospital represented to the Bankruptcy Court that it "maintained adequate internal controls to ensure the continued protection of its patients."

125.    The Court subsequently granted the Motion.

29

126.    After the entry of the Order granting the Motion, conditions at the hospital continued to deteriorate.  Staffing continued to be a problem. As the Hospital was purportedly an acute care facility without an emergency department, a physician had to serve "on-call" 24 hours per day.

127.    CHA, Stavens and Hallal, as officers and directors of the Hospital, decided that "on-call" meant physicians needed to merely be on-call, rather than a doctor actually dedicated exclusively to "on-call" service and on the premises of the Hospital.

128.    To meet this CMS provision of coverage of having a physician "on-call" 24 hours per day, CHA, Stavens and Hallal devised a plan whereby a physician, such as a radiologist, or Physician Investor, who happened to be performing services on that day, would serve on the 12 hour shift during the daylight period.  For the 12-hour overnight period, one of the Physician Investors would serve a 12-hour nighttime shift without pay, although, upon information and belief, some of these shifts were served from the homes of such Physician Investors.

129.    As a reminder, the Hospital held itself out as an acute care hospital, with many very sick patients staying overnight after cardiac surgery.  With many of the complications involved in cardiac surgery, it is doubtful a patient who coded overnight could survive the time for a physician to drive from the suburbs of Louisville, Kentucky (where a most of the Physician Investors lived) to Clarksville, Indiana.

130.    Furthermore, it is doubtful whether all Physician Investors who did serve these overnight shifts were properly trained to handle complications from cardiac surgeries (which were the primary procedures performed at the Hospital), since most of the Physician Investors were not critical care doctors or cardiologists and were instead general practitioners, onocologists or internists.  Additionally, many times the daylight on-call physician would be a radiologist or a

Physician Investor both performing other services at the Hospital.  In other words, such daylight physicians were not dedicated exclusively to "on-call" services for the patients.

131.    On information and belief, in late 2012 or early 2013, due to the lack of an ER, CMS cited the Hospital for violating the CMS's conditions of participation in the Medicare Program for failing to have a dedicated "on-call" physician during the daylight hours.

132.    On information and belief, whether it was appropriate for "on-call" physicians to serve nighttime shifts off-site in the comfort of a Physician Investor's bed was not considered in the CMS's determination.

133.    On information and belief, the Hospital did not disclose to its patient that it did not have a physician "on-site" at all times nor receive from such patient a signed acknowledgment from its patients that it understood that the Hospital did not have a physician "on-site" at all times as required by 42 U.S.C. 1395nn(i)(E)(i)(I) and (II).  The failure to obtain these acknowledge constitutes as noncompliance with the Stark Law.

134.    The on-call shifts is just one example of the Hospital's many lapses in compliance with federal, state and internal regulatory healthcare laws and procedures.  On information and belief, the Hospital failed to maintain adequate quality control review, physician reviews, or procedures for dealing with emergency situations in violation of state, federal and internal law. In short, the Hospital did not have the capacity to provide initial treatment for patients as required by 42 U.S.C. 1395nn(i)(E)(ii).

135.    On information and belief, the Hospital did not qualify for the "whole hospital" exception under the Stark Law.

136.    On information and belief, at that time and throughout the course of the bankruptcy, the Hospital did not actually have adequate internal controls to insure protection of its patients as

31

represented by its failure to have proper staffing at the Hospital, failure to properly equip the Hospital with necessary medical equipment, and failure to follow the Stark Law with regard to physician-owned hospitals and self-referrals.

137.    CHA was contractually obligated to provide healthcare compliance and ensure proper staffing and medical equipment under its Management Services Agreement with the Hospital.  CHA knew or was recklessly indifferent to the fact that the Hospital failed to have proper staffing, lacked necessary medical equipment, and failed to follow the Stark Law with regard to physician-owned hospitals and self-referrals.   Upon information and belief, based on its management and board role, CHA aided and abetted such behavior of the Hospital and actively participated in such violations all to the material detriment of patients.

138.    CHA, along with Stavens, Hallal, Campbell and LaRocca, as the Board of Directors of the Hospital, had a fiduciary duty to the Hospital to prevent such regulatory violations, as well as litigation costs associated with such violations.   CHA, along with Stavens, Hallal, Campbell and LaRocca, as Board of Directors of the Hospital, knew or should have known, and were recklessly indifferent to the fact, that the Hospital failed to have proper staffing, lacked necessary medical equipment, failed to follow the Stark Law with regard to physician-owned hospitals and self-referrals and quite possibly violated AKS. Upon information and belief, based on its management and board role, CHA aided and abetted such behavior of the Hospital and actively participated in such violations all to the material detriment to patient care.

139.    In the Bankruptcy Plan, CHA was subsequently awarded an unsecured claim for its services under its Management Services Agreement with the Hospital, with funding provided by Rialto.  Upon information and belief, CHA's received the largest share of the funds made available

for distribution to unsecured creditors.   Furthermore, CHA was the largest shareholder of the Hospital, yet never made a capital contribution.

140.    In the Bankruptcy Plan, Stavens and Hallal, each received an administrative claims for their allegedly unpaid "salaries" as Officers/Directors of the Hospital, and Stavens, Hallal and Campbell for allegedly unpaid on-call shifts, and for other services provided to the hospital. RLBB, as exit lender, provided the millions in funding for the reorganization including these administrative claims.   To the extent, such services represented by administrative claims for services which were invalid under the Stark Law, such claims were paid as a kickback under the AKS.

141.    Each of CHA, Stavens, Hallal and Campbell expected to derive valuable benefits, and did in fact materially benefit, from their actions to violate the Stark Law as well as other healthcare violations.

### III.    The Physician Investors' Personal Guarantees Of Hospital Debt and Resulting Judgments Against Them Created a Financial Relationship With the Hospital Through Debt or Other Means, in Violation of the Stark Law.

142.    Relator realleges and incorporates by reference the previous allegations of the First Amended Verified Complaint.

#### A.  The Joint and Several Guaranties of Equipment Leases

143.    The operating agreement applicable to the Physician Investors required them to guaranty certain equipment leases of the Hospital on a pro rata basis based on their ownership percentage in the Hospital. The operating agreement also required them to guarantee the mortgage debt of KMCREI on a capped basis relative to their investment. The Physician Investors did in

fact sign personal guaranties on a number of multi-million dollar debt obligations.  However, in violation of the operating agreement, most of these guaranties were not proportional to ownership interest (i.e. a 1% ownership interest should have corresponded to a guaranty of 1% of a lease or loan).  Instead, in most cases, through the fraudulent inducement of Stavens and Hallal, the Physician Investors unwittingly signed joint and several personal guaranties with the result that each physician was obligated to pay 100% of a number of multi-million dollar obligations, exposing them to repayment of 100% of the indebtedness, far in excess of their ownership percentages. This was the basis for the Relator's successful fraud claim against Stavens and Hallal in state court.   The joint and several personal guarantees signed by the Physician Investors absolutely guaranteed the repayment of equipment leases/loans  from The Leasing Group (approx. $3 million), Diversified Equipment Leasing (approx. $4 million), Med One Capital Funding LLC (approx. $1 million), Steris Corporation (approx. $700,000), and Cardinal Health (approx. $500,000). By way of example, Relator wound up with guarantor liabilities of $9,952,727.91, despite his relatively small investment of $40,000.  Every other Physician Investor found him or herself in a similar position.

144.    The Physician Investors gave the personal guaranties as financial accommodations for the benefit of the Hospital and KMCREI.   Through the creditworthiness of the Physician Investors, the guaranties allowed the Hospital and KMCREI to obtain large loans that would otherwise not have been extended. As a matter of law, if the physicians were ever required to fulfill their obligations as secondary obligors, they would have the right to reimbursement from the Hospital under principles of subrogation or indemnity. Thus, the various guaranties placed the Physician Investors into a debt relationship with the Hospital and/or a financial relationship by other means, which provided a strong incentive to make patient referrals.

145.    The Physician Investors also gave a joint and several guaranties as financial accommodations for the benefit of other physician investors.  Being joint and several, any creditor could collect an entire judgment from only one physician investor.  In turn, that physician investor could potentially seek contribution from any other physician investor(s).  Thus, any one physician investor or group of physician investors who paid off a creditor would be financially accommodating the other joint and several guarantors.

146.    With regard to guaranties related to the Hospital that are secured by the Hospitals property, such accommodation would not be in compliance with the Stark Law pursuant to 42 U.S.C Section 1395nn(i)(D)(iv).

147.    When it was arranging the financing for the Hospital, CHA recognized that giving a joint and several guaranty or any guaranty for the Hospital could be construed as a financial accommodation for Physician Investors of the Hospital.  As a result, it did not guaranty the lease payments from the Hospital to KMCREI nor the guaranty the line of credit from First Tennessee. On information and belief, the provision mentioned above in the Operating Agreement of KI forbidding joint and several liability of Physician Investors was inserted to prevent one Physician Investor from financially accommodating all other Physician Investors in violation of the Stark Law.

148.    Faced with lack of options for financing of the Hospital Project, CHA, along with Stavens and Hallal, induced the Physician Investors to enter into these joint and several guaranties in violation of both the KI Operating Agreement and the Stark Law.

149.    As a matter of law, if the physicians were ever required to fulfill their obligations as secondary obligors, they would have the right to reimbursement from the Hospital and Physician Investors under principles of subrogation, indemnity and contribution. Thus, the various guaranties

placed the Physician Investors into a debt relationship with other Physician Investors and/or a financial relationship by other means, which provided a strong incentive to make patient referrals.

150.     By their very nature, joint and several guaranties of hospital indebtedness provide an enormous incentive for physicians to refer patients to a hospital to prevent the hospital from defaulting on guaranteed obligations. The Stark law was specifically designed to prevent such financial relationships from creating a captive referral base. However, the Hospital, through its management, CHA, Stavens, Hallal, Campbell, and Larocca, proceeded with soliciting the guaranties from Physician Investors, apparently relying on the whole hospital exception to the Stark Law.

151.     On or about April 28, 2011, the Jefferson Circuit Court entered judgments against the Physician Investors on their joint and several guaranties of the approximately $3 million in Hospital equipment lease debt held by the Leasing Group.  As a matter of law, to the extent Leasing Group satisfied these judgments through collections on the Physician Investors, they would have the right to seek reimbursement from the Hospital under principles of subrogation or indemnity. A number of Physician Investors who had paid amounts on the Leasing Group judgments filed proofs of claim in the Hospital Bankruptcy Case asserting these rights.

152.     Thus, from their time of entry in 2011, the Leasing Group judgments placed the physicians into a debt relationship with the Hospital and/or a financial relationship by other means, which provided a strong incentive to make patient referrals, in violation of the Stark Law. These prohibited investment interests did not exist as of December 31, 2010 and therefore could not fall under grandfathering provisions of the Affordable Care Act.

   **B.  The RL BB Judgments**

153.    As set forth above, in 2011, RL BB obtained huge judgments against the Physician Investors who had signed guaranties of the mortgage indebtedness purchased from BB&T.  With respect to Stavens, Hallal and Campbell, these liabilities exceeded seven figures apiece.  Upon information and belief, the judgments against those three patient referrals sources remain outstanding to this day.  Upon information and belief, the judgments against a number of other Physician Investors remain outstanding.

154.    CHA was not required to execute a guaranty for the BB&T debt and thus was spared the collection efforts of a judgment lien held by RL BB against it.

155.    As a matter of law, if RL BB ever satisfied these judgments through collections on the Physician Investors, they would have the right to seek reimbursement from KMCREI under principles of subrogation or indemnity. A number of Physician Investors who had paid amounts on the RL BB judgments filed proofs of claim in the KMCREI Bankruptcy Case asserting these rights against KMCREI.

156.    Thus, from their time of entry in 2011, the RL BB judgments placed the physicians into a debt relationship with a financially interdependent affiliate of the Hospital and/or a financial relationship by other means, which provided a strong incentive to make patient referrals to the Hospital, in violation of the Stark Law. These prohibited investment interests did not exist as of December 31, 2010 and therefore could not fall under grandfathering provisions of the Affordable Care Act.

## COUNT I

### PAYING KICKBACKS AND PROVIDING VALUABLE BENEFITS TO INDUCE REFERRALS IN VIOLATION OF THE ANTI-KICKBACK STATUTE AND STARK LAW, WHILE FALSELY CERTIFYING COMPLIANCE IN VIOLATION OF THE FALSE CLAIMS ACT

### (AGAINST THE HOSPITAL, RL BB, RL BB-IN, AND RIALTO)

157.    Relator realleges and incorporates by reference the previous allegations of the First Amended Verified Complaint.

158.    The Hospital, Rialto, RL BB-IN and RL BB did knowingly and willfully offer to pay, and/or did actually pay, remuneration directly or indirectly, in cash, equity, or in kind, to Stavens, Hallal, Campbell, and LaRocca, who agreed to accept such remuneration, in the form of (a) equity in KMCREI; (b) protection from  civil suits brought by Relator and other physicians; (c) RL BB's forbearance from pursuing in excess of nine million dollars in judgments it held against Stavens, Hallal, and Campbell; (d) accelerated payments to Hall Robb, which was owned in part by Stavens, Hallal, Campbell, and LaRocca, and certain family members of Stavens and Hallal which, in turn, resulted in releases of agreed judgments against Stavens, Hallal and Campbell; and (e) arranging the settlement of tort claims against Stavens, Hallal, Campbell, and LaRocca.

159.    Such kickbacks, benefits, and remuneration were promised, and/or actually made, to induce Stavens, Hallal, Campbell, and LaRocca to refer and arrange for patients to be sent to the Hospital for services covered under a federal health care program, for which the U.S. would pay in whole or in part under Medicare or Medicaid.

160.    These kickback arrangements did not satisfy the "safe harbor" preconditions included in the Anti-Kickback Statute. As a result, these Defendants all acted in violation of the Anti-Kickback Statute.

161.    In addition, Stavens, Hallal, Campbell, and LaRocca had a financial relationship with the Hospital, mediated and arranged by RL BB, RL BB-IN, Rialto, and Hall Robb, consisting of ownership and/or investment relationships, debt relationships, compensations arrangements, or financial relationships by other means which are prohibited by the Stark Law and do not fall within

38

any exception.

162.     The personal guaranties given by Physician Investors and the resulting personal judgments obtained by Rialto against Physician Investors created a financial relationship with the Hospital which are prohibited by the Stark Law and do not fall within any exception.

163.     Given the strict liability of the Stark Law, any referrals of Medicare patients by Physician Investors to the Hospital, including without limitation Stavens, Hallal, Campbell, and LaRocca, were barred by the Stark Law because of such prohibited financial relationships. The Hospital was aware of these prohibited financial relationships during the time in which it billed the U.S. or services provided to such Medicare patients.

164.     At all times relevant to the Complaint, the Hospital, as a condition of payment, has knowingly and falsely certified its compliance with the Anti-Kickback Statute and Stark Law 42 U.S. Code § 1395nn(a), (d), to the United States.  Such false certifications were material when submitting claims for reimbursement from the United States.  The United States relied on such false certifications when paying such reimbursement and thereby the Hospital violated the False Claims Act. In addition, the violations of the Anti-Kickback Statute constitute per se violations of the FCA.


**COUNT II**

**CONSPIRACY TO PAY KICKBACKS AND PROVIDE VALUABLE BENEFITS TO INDUCE REFERRALS IN VIOLATION OF THE ANTI-KICKBACK STATUTE AND STARK LAW, WHILE FALSELY CERTIFYING COMPLIANCE IN VIOLATION OF THE FALSE CLAIMS ACT**

**(AGAINST THE HOSPITAL, RL BB, RL BB-IN KRE OP, RL BB-IN KRE RE, RIALTO, STAVENS, HALLAL, CAMPBELL, LAROCCA, KMCREI, HALL ROBB AND CHA)**

165.     Relator realleges and incorporates by reference the previous allegations of the First

Amended Verified Complaint.

166.    The Hospital, RL BB, RLBB-IN KRE OP, RLBB-IN KRE RE, KMCREI, Hall Robb, Stavens, Hallal, Campbell, LaRocca, and CHA each individually agreed to, and entered into a conspiracy with one another to participate in all illegal scheme involving the (a) offering, payment, and acceptance of kickbacks in exchange for, and to induce, patient referrals to the Hospital in violation of the AKS and satisfying no safe harbor conditions; and (b) the creation and sustaining of prohibited financial arrangement to induce patient referrals in violation of the Stark Law and satisfying no exceptions to same.

167.    Each of the above Defendants engaged in one or more overt acts in furtherance of the conspiracy including without limitation participating in, engaging in, facilitating, and expressly or impliedly consenting to the offering, payment and acceptance of kickbacks, compensation, and financial relationships by other means. Such overt acts included the inducement of personal guaranties resulting in personal judgments; the purchase of Hospital debt; the payment of Hospital debt and satisfaction of judgments of creditors; the collection and forbearance from collection of judgments against Physician Investors; the bringing and settling of claims; the formulation of the reorganization plans in the Bankruptcy Cases, and the referral of patients to the Hospital.

**WHEREFORE**, Relator respectfully requests this Court to enter judgment against Defendants as follows:

(a)     That the U.S. be awarded damages against the Defendants, jointly and severally, in the amount of three times the damages sustained by the U.S. because of the false claims and fraud alleged within this First Amended Verified Complaint, as the Civil False Claims Act, 31 U.S.C. §3729 et. seq. provides;

(b)     That civil penalties in the maximum amount allowed by law be imposed for each

and every false claim that Defendants presented to the U.S. and/or its grantees;

(c)     That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which Relator necessarily incurred in bringing and pressing this case;

(d)     That the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act for which redress is sought in this First Amended Verified Complaint;

(e)     That the Relator be awarded the maximum amount allowed to him pursuant to the False Claims Act;

(f)     That this Court award such other and further relief as it deems proper.

## <u>DEMAND FOR JURY TRIAL</u>

Relator, on behalf of himself and the United States, demands a jury trial on all claims alleged herein.

Dated: September 14, 2016

## VERIFICATION

After being duly sworn, I, Abdul Buridi, have knowledge concerning the matters set forth in the foregoing complaint, and do hereby verify, certify, swear, and affirm that the allegations contained in the foregoing complaint are true and accurate to the best of my information, knowledge, and belief.


        /s/ Abdul Buridi
        ABDUL BURIDI



COMMONWEALTH OF KENTUCKY          )
                                  )
COUNTY OF JEFFERSON               )

The foregoing Verification was subscribed and sworn to and/or acknowledged before me by ABDUL BURIDI, on this the 14th day of September, 2016.

My Commission expires on the 10 day of December, 2016.


        /s/ Miles S. Apple
        NOTARY PUBLIC,
        STATE-AT-LARGE

Respectfully submitted,


  /s/ Miles S. Apple

Miles S. Apple
APPLE LEGAL PLLC
6006 Brownsboro Park Boulevard
Suite E
Louisville, KY 40207
Telephone: (502) 415-4165
Facsimile: (502) 805-0546
Miles.apple@att.net
   *Counsel for Relator, Abdul G. Buridi*